**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVIE LAMAR FIELDS,
          *Petitioner-Appellant,*

v.

JILL BROWN,* Warden, of
California State Prison at San
Quentin,

          *Respondent-Appellee.*

No. 00-99005

D.C. No.
CV-92-00465-DT

STEVIE LAMAR FIELDS,
          *Petitioner-Appellee,*

v.

JILL BROWN,* Warden, of
California State Prison at San
Quentin,

          *Respondent-Appellant.*

No. 00-99006

D.C. No.
CV-92-00465-DT

OPINION

Appeals from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted
December 13, 2006—San Francisco, California

Filed September 10, 2007

*Jill Brown is substituted for her predecessor, Jeanne S. Woodford, as
Warden of California State Prison at San Quentin. *See* Fed. R. App. P.
43(c)(2).

Before: Mary M. Schroeder, Chief Judge, and
Stephen Reinhardt, Alex Kozinski, Diarmuid F. O'Scannlain,
Pamela Ann Rymer, Sidney R. Thomas, Barry G. Silverman,
M. Margaret McKeown, Kim McLane Wardlaw,
Ronald M. Gould, Marsha S. Berzon, Richard C. Tallman,
Richard R. Clifton, Consuelo M. Callahan, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Rymer;
Partial Concurrence and Partial Dissent by Judge Gould;
Dissent by Judge Berzon

**COUNSEL**

David S. Olson, Kulik, Gottesman, Mouton & Siegel, Sherman Oaks, California, for the petitioner-appellant/cross-appellee.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief Assistant Attorney General; Pamela C. Hamanaka, Senior Assistant Attorney General; Kristofer Jorstad, Deputy Attorney General; and Keith H. Borjon, Supervising Deputy Attorney General, Los Angeles, California, for the respondent-appellee/cross-appellant.

---

**OPINION**

RYMER, Circuit Judge, with whom Chief Judge Schroeder and Judges Kozinski, O'Scannlain, Silverman, Tallman, Clifton, Callahan, and Bea join, and with whom Judges McKeown, Wardlaw, and Gould join in Parts I-III.

Stevie Lamar Fields, a California state prisoner, was convicted in 1979 for the robbery and murder of Rosemary Cobbs, a student librarian at the University of Southern California; the robbery of Clarence Gessendaner at gunpoint; the kidnaping for robbery, robbery, rape, forced oral copulation, and assault with a deadly weapon on Gwendolyn Barnett; the kidnaping for robbery and forced oral copulation of Cynthia Smith; and the kidnaping, robbery, rape, and forced oral copulation of Colleen Coates, also a young student at USC. He was sentenced to death. Both the convictions and sentence were upheld by the courts of California.

On the federal side, the district court found no constitutional error in Fields's conviction, but granted a writ of habeas corpus on Fields's claim that the jury considered extrinsic evidence during the penalty phase. Rehearing cross-

appeals from these rulings en banc, we consider whether Fields was denied a fair trial on account of juror bias, on which the district court held an evidentiary hearing at our request, and whether his sentence should be set aside because of the jury's consideration of the foreperson's notes about the "pros" and "cons" of capital punishment that included Biblical references.

We conclude that the questioned juror's presence on the jury did not undermine its impartiality, so we affirm denial of the writ as to the conviction. As we see no prejudicial constitutional error at the penalty phase, we reverse this part of the district court's judgment. The effect is to deny habeas relief, thereby leaving Fields's convictions and sentence in place.

I

Fields was paroled from prison on September 13, 1978, after serving a sentence for manslaughter for bludgeoning Albert Allen to death with a bar-bell. Fourteen days later, he went on a three-week, "one-man crime wave." *People v. Fields*, 35 Cal. 3d 329, 336 (1983) (so describing Fields's spree).[1]

On September 27, 1978, Fields's sister Gail saw him with Rosemary Cobbs, a 26-year-old woman who worked as a student librarian at USC, at the Fields residence. When Gail went into Fields's bedroom the next morning, Rosemary was naked on the bed and Fields was standing by the door. Fields handed Gail a check signed by Cobbs for $185 but, after looking at her checkbook, he called Rosemary a "bitch" and told her to write another check for $222. Fields then told Rosemary that he would "bump her off" because "she run a game on him"

---

[1]We take this summary of facts from the opinion of the California Supreme Court, *People v. Fields*, 35 Cal. 3d 329, 336-40 (1983), and our prior opinion in *Fields v. Woodford* (*Fields II*), 309 F.3d, 1095, 1098-1100 (9th Cir. 2002), *amended by* 315 F.3d 1062.

by writing a check for less than the balance of her account. Later on the 28th, Debbie, a 16 year-old girl who was the former girlfriend of Fields's brother, went to Fields's residence and saw Rosemary and Fields go into his bedroom. Fields came out and asked Debbie if she wanted to see how he punished his girlfriends. Debbie said "no," but Fields pushed her to the door where she saw Rosemary naked and tied to the bed. Then Fields went into the bedroom with a gun and told Rosemary that he would kill her if she did not give him money, and that he was going to take her on a long trip "and she wasn't never going to come back." That afternoon, Debbie saw Fields, Gail, and Rosemary get into a car Gail borrowed from her godfather and drive away. Fields and Rosemary were in the back seat. As Gail was driving toward the Santa Monica Freeway, she heard a gunshot and heard Rosemary cry out: "Oh, God." Fields told Gail to keep on driving, and fired four more shots. Still, Fields said Rosemary was not dead and he needed to be sure she was, so he hit her in the head with a blunt object. Then Gail drove to an alley near the Fields residence where Fields left Rosemary's body. Debbie saw Fields and Gail return without Rosemary; she asked about her, and Fields replied, "She was going on a long trip and was never coming back." The car that was returned to Gail's godfather had two bullet holes in it; a bank official verified the $222 check from Rosemary to Gail; and Rosemary's purse, driver's license, and a torn check from Rosemary to Gail for $185 were found in Fields's residence.

On October 2, 1978, Clarence Gessendaner parked his Pontiac Trans Am outside a drug store. Armed with a gun, Fields approached him with another man and demanded his car keys. Fields also asked for money. Victims of subsequent crimes all saw Fields driving Gessendaner's Trans Am.

These included Gwendolyn Barnett and Cynthia Smith, both prostitutes. On the morning of October 5, Fields and a 17-year-old friend, William Blackwell, who had a gun, ordered the two women into the Trans Am. Fields drove to an

alley near his residence, took the gun from Blackwell, and directed Barnett and Smith into the house and to the upstairs bedroom. Fields ordered Barnett to remove her clothes and took $50 hidden in her stockings. He inspected her for venereal disease and told her to do whatever Blackwell wanted; Blackwell raped her. Meanwhile, Fields took Smith into another room, compelled her to disrobe, and took about $100 from her. The group then assembled in the same room and smoked marijuana. Fields told Barnett to have oral sex with Smith, which she did, then ordered her to perform anal sex, which she refused. For this, Fields struck Cynthia with the gun, breaking her jaw as well as the handle of the gun. Fields raped Gwendolyn, while Blackwell raped Cynthia. Gwendolyn passed out but when she awoke, she saw Blackwell holding a knife and heard Fields tell him, "Man, go and cut the bitch up. You can't just leave her laying there." Fields told Cynthia to clean up the blood from Gwendolyn's injury. After Fields ordered the women to go with him and Blackwell to find more prostitutes to rob, and they did, he released them. The police found Gwendolyn's wig and blouse and Cynthia's identification card, as well as extensive blood stains on the mattress where Gwendolyn had lain.

Within a few hours Fields and Blackwell approached Colleen Coates, an 18-year-old student, in a restaurant parking lot, ordered her at gunpoint into the Trans Am, and drove back to the Fields house. Fields ordered her into his bedroom, took about $12, and instructed Colleen to remove her clothes. He struck her for not doing so fast enough. He directed her to perform oral sex on him and to submit to intercourse. Fields demanded more money; Colleen said she could withdraw $2000 from a savings account, so she tore out a Crocker Bank page from the telephone book, and went with Fields to the local branch. However, they returned to the Fields residence without withdrawing the money because Fields thought there were too many people around. Fields told Colleen he would have to kill her because she had too many counts on him; Colleen begged him not to. She tried to escape by throw-

ing herself backwards through a closed window in the bed-
room, but Fields pulled her back in. The next morning Fields
told Colleen he would let her go if she would buy marijuana
for him, which she did. The torn page from the telephone
book was found in the Trans Am, and the book with that page
missing was found in Fields's residence. Fields's mother wore
Colleen's blouse to a preliminary hearing.

Fields was convicted of the robbery-murder of Cobbs, with
the special circumstance of willful, deliberate, and premedi-
tated murder during the commission of a robbery; the robbery
of Gessendaner; the kidnaping for robbery and forced oral
copulation of Smith; the kidnaping for robbery and robbery of
Barnett, as well as her rape, forcible oral copulation, and
assault with a deadly weapon; and the kidnaping, robbery,
forcible oral copulation, and rape of Coates. In a separate
phase, the jury determined that Fields was sane. At the pen-
alty phase, the parties stipulated that all evidence heard in the
guilt and sanity phases would carry forward and that Fields
had been convicted in 1976 of the voluntary manslaughter of
Albert Allen. The jury fixed the punishment at death under
the 1977 California death penalty law. After independently
reviewing the record, the trial court denied Fields's motion for
new trial and for modification of the verdict.

The California Supreme Court affirmed Fields's conviction
and sentence on December 29, 1983. 35 Cal. 3d at 336. Fields
filed a petition for habeas corpus in the state supreme court
claiming ineffective assistance of his trial counsel, Carl Jones,
which was denied after appointment of a referee who con-
ducted an evidentiary hearing. *In re Fields*, 51 Cal. 3d 1063
(1991).

Fields brought his first federal habeas corpus petition on
May 25, 1993. The district court stayed proceedings to allow
an opportunity to pursue unexhausted claims in state court.
Fields filed a second petition for collateral review in the Cali-
fornia Supreme Court, which was denied on October 14,

1994, in part on the merits and in part on the procedural ground of untimeliness. He filed a second amended habeas petition in district court on March 31, 1995, raising a number of claims which the district court held were procedurally barred. We reversed, *Fields v. Calderon* (*Fields I*), 125 F.3d 757, 759 (9th Cir. 1997), *cert. denied*, 523 U.S. 1132 (1998), and the parties filed cross-motions for summary judgment on all claims. The district court upheld the conviction, but ordered that the sentence be vacated and that Fields be sentenced to life in prison without the possibility of parole unless a new penalty trial were held within 60 days.

Fields and the state both appealed. As Fields's petition was filed before April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA does not apply to the merits of the appeal.[2] The panel affirmed on all guilt phase claims except for a claim of juror bias (and the related claim of ineffective assistance of counsel), on which it remanded for an evidentiary hearing. *Fields v. Woodford* (*Fields II*), 309 F.3d 1095, 1106 (9th Cir.), *amended by* 315 F.3d 1062 (9th Cir. 2002). Following a hearing, the district court found that Juror Hilliard was not dishonest during voir dire, that he was not actually biased, and that application of the implied bias doctrine in the absence of dishonesty would be a new rule barred by *Teague v. Lane*, 489 U.S. 288 (1989). It also found that the Hilliards had no discussions during trial about the trial that affected juror Hilliard's ability to be fair and impartial.

Fields renewed appeal on these issues. The panel affirmed denial of the writ on his claim of juror impartiality. *Fields v. Woodford* (*Fields III*), 431 F.3d 1186 (9th Cir. 2005). Having

---

[2]AEDPA does govern whether a petitioner may appeal after AEDPA's effective date. *Slack v. McDaniel*, 529 U.S. 473 (2000). Accordingly, we treated Fields's notice of appeal as a request for a Certificate of Appealability, and found that he made the requisite showing on each of the issues raised. *Fields II*, 309 F.2d at 1101.

reserved sentencing issues until the conviction was settled, the panel concluded that Fields had failed to show prejudicial constitutional error and so reversed this part of the judgment. We granted rehearing en banc.[3] *Fields v. Woodford*, 465 F.3d 397 (9th Cir. 2006).

## II

### A

When responding on voir dire to one of the trial court's posted questions[4] — whether the prospective juror had ever been a crime victim or witness, arrested or charged with a crime, or involved in criminal charges or litigation — Floyd Hilliard stated that his "wife was assaulted and beaten, robbed, two years ago Christmas" in Los Angeles. The judge observed that some of the charges involved in the Fields case were robberies and asked whether Hilliard thought "it is going to make it difficult for you to be a fair, impartial juror in the case now pending before this court as a result of the experience your wife went through?" Hilliard replied: "I doubt it. I think I'd base it strictly on the charges and the evidence that's presented." When the judge asked: "And you would accept

---

[3]Amicus briefs in support of Fields's petition have been filed by the California Attorneys for Criminal Justice and the California Council of Churches. An amicus brief supporting the state's petition was filed by Wallbuilders, Inc.

[4]The posted questions were written and included: (1) the prospective juror's business or occupation; (2) the prospective juror's spouse's business or occupation; (3) the ages of the prospective juror's children and their occupations or where they attended school; (4) the general area where the prospective juror lived; (5) the prospective juror's previous jury experience; (6) whether the prospective juror had ever been a crime victim or witness, arrested or charged with a crime, or involved in criminal charges or litigation; (7) whether the prospective juror had any legal or law enforcement background, training, or experience; (8) whether the prospective juror had any friends or relatives who were in law or law enforcement; and (9) whether the prospective juror knew of any reason that he or she could not serve as a fair and impartial juror.

and follow the law given to you by the court and apply it, to the best of your ability, to the facts as you determine them to be?," Hilliard responded "Definitely." Counsel asked no questions and Hilliard was empaneled without challenge.

The present dispute centers around a declaration from Diane Hilliard, Floyd Hilliard's wife, that Fields obtained in 1993. It indicated that she was confronted at gunpoint by a young African-American male in his early twenties, bound, blindfolded, driven to a secluded area, beaten, raped, and robbed. The attacker told Hilliard's wife that he knew where she lived and would be back to "finish you off." He was never apprehended. These events were traumatic and had a radical effect on the Hilliards' lives; they changed the locks on their house and Hilliard stood guard with a gun for several weeks. Diane Hilliard's declaration also indicated that during trial she began to suspect that Fields might be the person who accosted her. She asked her husband if she could go to the courtroom, but he said no; Mrs. Hilliard thought he was afraid that if they knew about her case, Fields would get off. Juror Hilliard's 1995 declaration, which he reaffirmed in 1999, averred that he never confused the events that occurred to his wife with the facts presented in the Fields case, he did not urge other jurors to follow any course of action because of his wife's experience, and he was one of the jurors who initially defended Fields in deliberations. Another juror's 1995 declaration stated that Hilliard often talked about his wife, but did not say what about; a second juror declared that he was aware that Hilliard's wife had been raped.

The panel was reluctant to resolve Fields's claim of juror bias on this record, and therefore remanded for an evidentiary hearing. *Fields II*, 309 F.3d at 1105-06. At the subsequent evidentiary hearing, the district court received testimony taken in March 2003 by videotape of Floyd Hilliard, Diane Hilliard, and the two other jurors whose 1993 declarations pertained to Hilliard. The district court found Hilliard credible. In testimony the court credited, Hilliard explained that during voir

dire he volunteered that his wife had been assaulted and beaten, intending for people in the courtroom to understand that she had been sexually abused without his having to be explicit about the details. He noted that twenty-five years ago people were not as free and open in talking about sexual assaults as they are today. He did not intend to hide the fact that his wife had been sexually assaulted and if anyone had asked for specifics, Hilliard would have told them. He was mildly surprised when no one sought to strike him, and it would have been fine with him if the judge and attorneys did not want him on the jury. However, Hilliard was prepared to do his duty and serve if selected. If asked, Hilliard would also have said with respect to the charges involving sexual assault that he could be fair and impartial and that he doubted that the attack on his wife would have influenced him. He said he "doubt[ed]" he would have difficulty being fair and impartial only "because you can never be sure what's in the back of your mind." Hilliard stated that he told the truth when he told the judge that he would base his decision strictly on the evidence presented. Hilliard, who like Fields is African-American, testified that he did his best to be a fair juror, giving Fields the benefit of the doubt when others were against him; he did not think that the nature of his wife's case, the fact that no arrest had been made, and that her attacker (like Fields) was a young African-American male had any impact on him. He did not confuse Fields with his wife's attacker and did not mention the crimes against his wife to other jurors. When Mrs. Hilliard asked her husband about the case, he responded that he was not at liberty to discuss it. Hilliard did not tell his wife about the crimes charged, though he might have told her what Fields's race was afterwards. When Mrs. Hilliard told him she thought Fields might be the man who assaulted her, he told her he doubted it and thought she was a little paranoid. Hilliard testified that it never crossed his mind that Fields was the person who assaulted his wife. He also testified that Mrs. Hilliard's 1993 assumption that he was afraid Fields would get off was incorrect. He refused Diane's

requests to come to the trial because he did not want her to compromise him as a juror and was concerned that she would be traumatized by the testimony, which would affect their home life.

Diane Hilliard testified that she knew little about Fields's case because her husband did not discuss it. She knew only that the case involved a young African-American man who had abducted and shot someone; she did not know if the case involved rape charges or if Fields was in his twenties. Diane did want to go to court to see if Fields was the man who had accosted her, but her husband refused to let her go. This did not upset her. She said her 1993 declaration (prepared by Fields's investigator) was untrue when it stated that she believed her husband was afraid that if they knew about her case, Fields would get off. Hilliard told her he advised the court about her case during jury selection.

Juror Henry testified that Hilliard talked about his wife being the first black woman fire fighter, but nothing else. Juror Warner testified that he became aware that Hilliard's wife had been robbed, beaten, and raped during voir dire, but otherwise Hilliard didn't talk about it.

Considering the entire record, including the 1993 and 1995 declarations, the district court found that juror Hilliard did not intend to mislead the trial court when he stated that his wife was "assaulted and beaten, robbed, two years ago Christmas." The court also found that Hilliard and his wife did not have any discussions during the trial about its subject matter that affected Hilliard's ability to be fair and impartial.

## B

Fields's claim of juror bias puts three theories on the table: so-called *McDonough*-style bias,[5] which turns on the truthful-

---

[5]*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) (plurality) (holding that to get a new trial based on a juror's responses in

ness of a juror's responses on voir dire; actual bias, which stems from a pre-set disposition not to decide an issue impartially; and implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury. In short, Fields posits that Hilliard's failure to disclose his wife's rape and kidnaping, and to reveal his misgivings about serving as a juror, was untruthful. Actual bias can be inferred from this, together with the fact that the evidence at trial triggered memories of the attack on his wife and the fact that Hiliard talked with her about her suspicions during the trial. And Hilliard was impliedly biased as his wife's similar experience created the potential for his own substantial emotional involvement adversely affecting impartiality. We discuss each in turn.

**[1]** The Sixth Amendment guarantees a criminal defendant a fair trial. "One touchstone of a fair trial is an impartial trier of fact — 'a jury capable and willing to decide the case solely on the evidence before it.' " *McDonough*, 464 U.S. at 554 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). As the Supreme Court recognized in *McDonough*, "[v]oir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." *Id.* at 554.

**[2]** *McDonough* was a personal injury action in which a prospective juror failed to respond affirmatively to a question on voir dire seeking to elicit information about previous injuries to members of the juror's immediate family that resulted in disability or prolonged pain. In fact, the juror's son had broken his leg as a result of an exploding tire, but the juror

voir dire, a party must demonstrate that the juror failed to answer honestly and that a correct response would have provided a basis for a challenge for cause).

evidently did not believe this injury was relevant to the inquiry. After judgment for McDonough, Greenwood sought a new trial on the basis of juror bias. The Court observed:

> To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.

*Id.* at 555. Accordingly, the Court held that "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556.

[3] After careful consideration of the entire record, the district court found that Hilliard did not respond dishonestly on voir dire and did not intend to mislead the trial court, or hide the facts of the attack on his wife, by using the word "assault" instead of "rape" and "kidnap" to describe what happened. Whether a juror is dishonest is a question of fact, *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc), and we are not firmly convinced that the district court's findings are wrong. *See Riley v. Payne*, 352 F.3d 1313, 1317 (9th Cir. 2003) (noting that a district court's factual findings are reviewed for clear error). Hilliard testified that he thought everyone would understand that using "assault" in the context of a beating and robbery of his wife would encompass a sexual assault. To the extent that he may have been mistaken in assuming this, it was an honest mistake for a layperson to make. *See Dennis v. Mitchell*, 354 F.3d 511, 521 (6th Cir.

2003) (holding that juror's misunderstanding of a legal term did not connote dishonesty); *McDonough*, 464 U.S. at 555 (observing that "jurors are not necessarily experts in English usage" and "may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges"); *see also Sanders v. Lamarque*, 357 F.3d 943, 947-50 (9th Cir. 2004) (holding that a juror was not dishonest in failing to disclose that twenty-five years previously she had lived in an area with gang activity); *Dyer*, 151 F.3d at 973 (observing that it follows from *McDonough* that "an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality"). Hilliard did not fail to volunteer details for any reason that implicated impartiality; he would have furnished them, if asked. But he wasn't asked, and in these circumstances we heed *McDonough*'s admonition not to invalidate the result of a trial.

**[4]** Likewise, we see no basis upon which to invalidate Fields's conviction on account of actual bias. We have defined actual bias as, in essence, " 'bias in fact' — the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (internal quotation marks omitted). Actual bias is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view. The determination of whether a juror is actually biased is a question of fact, *Dyer*, 151 F.3d at 973, that we review for "manifest error" or abuse of discretion, *Gonzalez*, 214 F.3d at 1112. We are satisfied that there was no manifest error in the district court's finding that Hilliard was not actually biased. He put aside what happened to his wife and did not confuse those events with what he had to decide about Fields. He truthfully represented that he was

impartial. He did not lie to conceal bias. While his wife speculated that Fields might be the person who accosted her, Hilliard himself did not. And the couple had no discussions during the trial about its subject matter because Hilliard understood that he was not at liberty to do so.

[5] This leaves Fields's argument that Hilliard was, nevertheless, impliedly or presumptively biased. As the panel recognized in remanding for development of a factual record, this is the most serious of Fields's challenges. The similarity of Diane Hilliard's experience to the charges against Fields clearly implicates our law on implied bias. Although the Supreme Court has not explicitly adopted (or rejected) the doctrine of implied bias, both concurring opinions in *McDonough* seem to embrace it, *see McDonough*, 464 U.S. at 556-57 (Blackmun, Stevens, and O'Connor, JJ., concurring);[6] *id.* at 558 (Brennan and Marshall, JJ., concurring in the judgment),[7]

---

[6]Justice Blackmun's concurrence for Justice Stevens and Justice O'Connor agrees with the Court that

> the proper inquiry in this case is whether the plaintiffs had the benefit of an impartial trier of fact. I also agree that, in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial. I therefore join the Court's opinion, but I write separately to state that I understand the Court's holding not to foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury. Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.

464 U.S. at 556-57 (Blackmun, J., concurring). Justice Blackmun cited to Justice O'Connor's concurring opinion in *Smith v. Phillips*, 455 U.S. 209 (1982), where she suggested that bias may be presumed when, for example, there is "a revelation . . . that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id.* at 222 (O'Connor, J., concurring).

[7]Justice Brennan's concurrence, in which Justice Marshall joined, agreed with the Court that less-than-complete information during voir dire

and our court has inferred or presumed bias on rare occasions. *See, e.g.*, *United States v. Allsup*, 566 F.2d 68, 71-72 (9th Cir. 1977); *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979); *Dyer*, 151 F.3d at 979; *Gonzalez*, 214 F.3d at 1112-14.

In *Allsup*, two jurors in a bank robbery trial were employees of a different branch of the bank that was robbed. 566 F.2d at 71. On direct appeal, we held that their relationship to the subject of the trial was too close for them to be impartial, therefore the trial court erred by failing to excuse the jurors for cause. *Id.* at 71-72.

*Eubanks* was a heroin conspiracy case. 591 F.2d at 516. We presumed bias on direct appeal from denial of a motion for new trial because the juror failed to disclose that two of his children were in prison for heroin-related crimes. *Id.* at 517. On a juror qualification form, the juror had indicated that he was married but had no children, and the juror did not respond to a question by the judge on voir dire whether "you or members of your immediate families [have] ever been personally interested in the defense of a criminal case or a witness for the defense in a criminal case[.]" *Id.* at 516. Had he answered truthfully, the trial court would have excused him. *Id.* at 517. In these circumstances, we concluded that the juror's sons' involvement with heroin barred the inference that he served impartially. *Id.*

---

does not by itself require a new trial, and would hold that "to be awarded a new trial, a litigant should be required to demonstrate that the juror incorrectly responded to a material question on *voir dire*, and that, under the facts and circumstances surrounding the particular case, the juror was biased against the moving litigant." *McDonough*, 464 U.S. at 557-58 (Brennan, J., concurring in the judgment). He would also have recognized that bias may be actual or implied (conclusively presumed as a matter of law), and accordingly, disagreed with the Court "that a new trial is not warranted whenever a prospective juror provides an honest answer to the question posed." *Id.* at 558-59.

In *Tinsley v. Borg*, 895 F.2d 520 (9th Cir. 1990), in contrast, a state prisoner who was convicted of rape contended in his 28 U.S.C. § 2254 petition that he was denied a fair trial because one juror was biased. *Id.* at 523. The juror stated during voir dire that she was a psychiatric social worker who was trained to deal with rape victims, but notwithstanding the nature of the charges involved in Tinsley's case, would be able to be a fair juror. *Id.* at 524. She also said that she did not recall counseling any rape victims; however, it turned out that she had testified once on behalf of a rape victim, an experience she found anxiety provoking. *Id.* At a hearing on Tinsley's motion for a new trial, the juror testified that she had been fair as a juror and had no recollection of thinking about the prior counseling episode during deliberations. *Id.* We acknowledged that bias may be implied when the case presents a relationship in which the " 'potential for substantial emotional involvement, adversely affecting impartiality,' " is inherent, *id.* at 527 (quoting *Allsup*, 566 F.2d at 71), or as the Fourth Circuit had put it, in " 'those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.' " *Id.* (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)). However, we concluded that the circumstances did not warrant a presumption of bias as neither the juror nor a close relative had been a rape victim or rapist, there was no personal connection between the juror and the defendant or victim, and the juror had no prejudicial information about the defendant himself. *Id.* at 529.

In *Dyer*, the juror on voir dire in a murder prosecution answered "no" to queries about whether she or any of her relatives had ever been the victim of any type of crime, and whether she or any of her relatives had ever been accused of any offense other than traffic cases. 151 F.3d at 972. The truth was that the juror's brother had been shot and killed six years earlier, and her husband was in jail. *Id.* at 972-73. We concluded that the juror plainly lied, and that her lies gave rise

to an inference that she chose to conceal important facts in order to serve as a juror and pass judgment on Dyer's sentence. *Id.* at 982; *see also Green v. White*, 232 F.3d 671, 676 (9th Cir. 2000) (presuming bias when the jury foreperson in a murder trial lied about his own prior felony conviction on a written jury questionnaire and in voir dire because the "pattern of lies, inappropriate behavior, and attempts to cover up his behavior introduced 'destructive uncertainties' into the fact-finding process" (quoting *Dyer*, 151 F.3d at 983)).

Like *Eubanks*, *Gonzalez* was a drug conspiracy case where prospective jurors were asked whether they or anyone close to them had any experience with illegal drugs. 214 F.3d at 1110. A juror answered affirmatively that her ex-husband had used and dealt cocaine, which was one of the reasons for their divorce four years previously, but the juror responded equivocally when asked three times whether she could put her personal experience aside and serve impartially. *Id.* at 1110-11. We held that denial of a cause challenge on either an express or implied bias theory required reversal given the juror's responses to the court's questions and the similarity between her experience and the defendant's alleged conduct. *Id.* at 1114.

**[6]** In sum, we have implied bias in those extreme situations "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances," *id.* at 1112 (quoting *Tinsley*, 895 F.2d at 527) (internal quotation marks omitted), or where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury, *Dyer*, 151 F.3d at 982. The standard is "essentially an objective one," *Gonzalez*, 214 F.3d at 1113, under which a juror may be presumed biased even though the juror himself believes or states that he can be impartial. *Dyer*, 151 F.3d at 982. Review is de novo, because implied bias is a mixed question of law and fact. *Gonzalez*, 214 F.3d at 1112.

Fields maintains that all the indicia for implied bias are present as Hilliard and his wife went through a personal experience that is similar to the fact pattern at trial; it is unlikely that a person in Hilliard's circumstances — whose wife was the victim of a recent unsolved crime by a person whom the defendant resembles and whom the wife suspects might be the one who attacked her — could be impartial; the incident involving Diane Hilliard and Hilliard's subsequent conversations with her during the trial present the potential for substantial emotional involvement adversely affecting his impartiality; and Hilliard was not honest during the voir dire process regarding the attack on his wife. Specifically, Fields contends that the same kind of emotional involvement exists in this case as in *Eubanks* and *Dyer* because Hilliard's wife had been affected by crimes similar to the ones of which he was accused; and that, as in *Allsup*, Hilliard also had a reasonable fear of violence as a result of crimes similar to the ones of which Fields was accused.

The state disagrees that the relationship is of the sort that we have previously found so extreme as to presume bias, which leads it also to invoke the *Teague* rule against retroactive application by a federal court of a new rule of constitutional law.[8] We must decide whether this is so before reaching the merits of Fields's claim. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) (instructing that if a state argues that the district court granted a habeas petition on the basis of a new rule of constitutional law that is *Teague*-barred, a court must address the *Teague* issue first); *Leavitt v. Arave*, 383 F.3d 809, 816 (9th Cir. 2004) (per curiam) (same).

In the state's view, a reasonable interpretation of precedent from when Fields's conviction became final[9] would not allow

---

[8]*Teague v. Lane*, 489 U.S. 288, 310 (1989) (holding, with exceptions, that a decision announcing a constitutional rule of criminal procedure that was not dictated by precedent existing at the time the defendant's conviction became final may not be applied on collateral review).

[9]This date, for *Teague* purposes, is October 9, 1984, the date the United States Supreme Court denied certiorari on Fields's direct appeal, *Fields v.*

a presumption of bias in the absence of a finding of juror dishonesty. The state submits that all but one case in the universe of implied-bias cases existing as of then involved dishonesty, *see McDonough*, 464 U.S. at 556; *Eubanks*, 591 F.2d at 516, and that the one case that did not, *Allsup*, 566 F.2d at 71, involved two jurors who were related by employment to the victim — a relationship which falls squarely within long-accepted standards for disqualification.

Fields counters that Hilliard's bias may be implied on account of more than just the similarity of the crimes against his wife. For example, extraneous matters such as the conversations that Hilliard had with his wife during trial are not *Teague*-barred because extrinsic information has long implicated the constitutional right to a fair trial. *See, e.g.*, *Remmer v. United States*, 347 U.S. 227, 229 (1954). He also argues that implied bias based on deficient responses to voir dire questions has been firmly established at least since *McDonough* came down on January 18, 1984. In addition, Fields points out that the concurring opinions in *McDonough*, and our opinion in *Allsup*, embraced a standard for implied bias that does not depend solely on dishonesty. *See McDonough*, 464 U.S. at 556-57 (Blackmun, Stevens and O'Connor, JJ., concurring); *id.* at 558 (Brennan and Marshall, JJ., concurring in the judgment); *Allsup*, 566 F.2d at 71-72 (finding implied bias even though juror disclosed she worked at a branch of the bank that was robbed).

We agree with Fields that the implied bias doctrine existed before 1984; we so held in *Dyer*. 151 F.3d at 984-85. But this

*California*, 469 U.S. 892 (1984). *See Snook v. Wood*, 89 F.3d 605, 612 (9th Cir. 1996) (explaining when a conviction becomes final for *Teague* purposes). However, Fields assumes — and the state does not dispute — that the relevant date is October 14, 1994, when the California Supreme Court denied his exhaustion petition that raised the issue of juror bias for the first time. There is no need for us to decide which is correct because the result is the same either way.

does not answer the more discrete issue raised by the state: whether the implied bias doctrine as it existed when Fields's conviction became final would have required a new trial in the absence of dishonesty during voir dire.

On the one hand, the Supreme Court has never held that a juror was impliedly biased in the absence of juror dishonesty. In *Dennis v. United States*, 339 U.S. 162 (1950), the court considered the problem, but refused to find that government employees were impliedly biased and thus automatically disqualified from serving on a jury where the government is a party. *Id.* at 172. Moreover, Justice O'Connor expressed the view that implied bias should only be presumed in "extreme" or "extraordinary" cases. *Phillips*, 455 U.S. at 222-23 & n.* (O'Connor, J., concurring); *see also Tinsley*, 895 F.2d at 527 (quoting same). Examples she gave of what might count as an "extreme" or "extraordinary" case were "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Phillips*, 455 U.S. at 222 (O'Connor, J., concurring). *McDonough*, of course, held that a party must demonstrate that a juror failed honestly to answer a voir dire question that is material to impartiality before a trial result could be invalidated. 464 U.S. at 556. However, the concurring opinions indicated that they did not understand the opinion to foreclose implied bias in the absence of juror dishonesty on voir dire. *Id.* at 556-57 (Blackmun, Stevens, and O'Connor, JJ., concurring); *id*. at 558-59 (Brennan and Marshall, JJ., concurring in the judgment). In light of these cases we have previously observed that it is an unresolved question whether dishonesty is a necessary predicate to a finding of juror bias. *See Dyer*, 151 F.3d at 979 n.12 (noting it was unnecessary to decide the issue because the juror there had lied during voir dire); *see also Fields II*, 309 F.3d at 1105 ("Beyond what these cases indicate, it is an open question whether dishonesty is required before bias may be found.").

On the other hand, we decided in *Allsup* that bias could be implied in the absence of juror dishonesty. The prospective jurors who worked for the victim bank had honestly disclosed their employment and stated that they could try the case fairly, but we nevertheless presumed bias on account of the fact that they worked for the bank that had been robbed and would have a "reasonable apprehension of violence" from bank robbers. 566 F.2d at 71-72. Although the nature of the relationship was different from Hilliard's in that the jurors in *Allsup* were directly interested in the victim, still it is difficult to conclude in light of *Allsup* and Justice O'Connor's concurrence in *Phillips* that presuming bias despite an honest disclosure of a potentially disqualifying relationship would have been a new rule of constitutional law in 1984.

The state also argues for the narrower proposition that no precedent at the time dictated that an honest juror is impliedly biased simply by virtue of his wife's victim status. While we agree that this is so, we do not require the existence of a case for *Teague* purposes "involving identical facts, circumstances, and legal issues." *Keating v. Hood*, 191 F.3d 1053, 1061 n.11 (9th Cir. 1999), *overruled on other grounds by Payton v. Woodford*, 346 F.3d 1204, 1217 n.18 (9th Cir. 2003) (en banc).

**[7]** *Teague* aside, it is well accepted that bias may be presumed only in "extreme" or "extraordinary" cases. We said in *Tinsley*, and reiterate now, that "[p]rudence dictates that courts answering this question should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." 895 F.2d at 527.

**[8]** "Instead of formal categorization, the Supreme Court has emphasized the existence of safeguards against actual bias." *Id.* at 527-28. The prime safeguard is voir dire. "In most situations, voir dire, 'the method we have relied on since the beginning,' should suffice to identify juror bias." *Id.* at 528 (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)).

This is because truthful disclosure of information during voir dire sets up a challenge for cause (or in less clear-cut cases, a peremptory challenge) that can be exercised before resources are devoted to trying the case to verdict. Cause challenges lie for implied (or presumed) bias as well as for actual bias. *See Gonzalez*, 214 F.3d at 1111. Honesty is the heart of the jury-selection process in an adversarial system; indeed, "voir dire" means "to speak the truth." The whole point of the voir dire process is to elicit information from the venire that may shed light on bias, prejudice, interest in the outcome, competence, and the like so that counsel and the parties may exercise their judgment about whom to seat and whom to challenge. As the Supreme Court elaborated in *McDonough*:

> One touchstone of a fair trial is an impartial trier of fact — "a jury capable and willing to decide the case solely on the evidence before it." *Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

464 U.S. at 554 (citation omitted) (quoting *Phillips*, 455 U.S. at 217).[10] Accordingly, when the issue of bias arises after trial

---

[10]Judge Berzon's assertion that "dishonesty during voir dire has little to do in general with the concerns underlying the implied bias doctrine," Berzon dissenting op. at 12041, is beguiling because of course it is true that those concerns have nothing to do with honesty or dishonesty in voir dire; concerns animating the implied bias doctrine are values in and of themselves. But it is not true that voir dire has nothing to do with protecting those core values. That's the whole point of voir dire: to elicit, through

(as it did in *McDonough* and *Tinsley*) or, as here, on collateral review of a conviction in state court, dishonesty in voir dire is the critical factor. As *McDonough* explains, "it ill serves the important end of finality to wipe the slate clean" when the potentially disqualifying relationship is disclosed on voir dire examination. 464 U.S. at 555.

[9] Hilliard honestly disclosed that his wife had been a victim of crimes that were quite similar to some of the crimes of which Fields was accused. Although we found implied bias in *Eubanks* based on similarities between the experience of a juror's relatives and the events giving rise to the trial, the juror had not been honest in voir dire about his sons' involvement with heroin. *Cf. Green v. White*, 232 F.3d 671, 676-78 (9th Cir. 2000) (presuming bias biased on pattern of lies); *Dyer*, 151 F.3d at 983 (presuming bias from juror's lies); *Gonzalez*, 214 F.3d at 1114 (holding that cause challenge should have been granted when juror equivocated on voir dire about ability to set aside emotional experience).

The implied bias that we found in *Allsup* was based on the jurors' direct relationship with the victim and their own vulnerability to the same type of conduct for which the accused bank robbers were on trial. Hilliard had no personal connection of this sort. He was not related to a participant, victim, or witness. The similarity of experiences was on account of his wife's experience, not his own. Although we have recognized that bias may be implied where close relatives of a juror "have been personally involved in a situation involving a similar fact pattern," *Tinsley*, 895 F.2d at 528; *Eubanks*, 591 F.2d

careful inquiry, indicators of bias — actual, implied, or merely imagined — in order to empanel a fair and impartial jury. If a prospective juror responds honestly, then the markers for implied, or actual bias appear. It is then up to the parties to pursue a challenge. When facts not dishonestly concealed come to light after the trial is over, and there has been a full evidentiary inquiry into whether the juror was really biased, there is no longer any need to "imply" anything. We know the actual facts.

at 517; *Dyer*, 151 F.3d at 982, we have never done so when the juror was honest on voir dire.

We decline to do so here. Hilliard's honest disclosure on voir dire about what happened to his wife was more than sufficient for follow-up that would have fleshed out whether the relationship between his wife's experience and some of the crimes charged was such that "it is highly unlikely that the average person could remain impartial in his deliberations . . . ." *Tinsley*, 895 F.2d a 527 (quoting *Person*, 854 F.2d at 664). Fields had a remedy at that point — a challenge for cause, which lies for implied as well as actual bias — that would have resulted in Hilliard's being excused, if well taken, or in a new trial (as in *Allsup*) if improperly denied.

To the extent that events or information bearing on Hilliard's honesty in voir dire or impartiality as a juror came after he was empaneled, the evidentiary hearing held by the district court afforded Fields an opportunity to show that Hilliard was not a fair and impartial juror. He failed to do so. The opportunity to show actual bias is a sufficient remedy and " 'a guarantee of a defendant's right to an impartial jury.' " *Phillips*, 455 U.S. at 216 (quoting *Dennis*, 339 U.S. at 171-72); *see also id.* at 215 (observing that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); *Williams v. Taylor*, 529 U.S. 420, 442-44 (2000) (quoting *Phillips* on the point and reiterating that the defendant may establish at an evidentiary hearing that a prospective juror who arguably failed to tell the truth on voir dire was not impartial).

**[10]** Knowing what we now know as a result of the evidentiary hearing, we see no basis for implying bias as a matter of law solely because Hilliard was the spouse of a rape victim. As a practical matter, many prospective jurors have close family members or friends who have suffered similar encounters. It is the role of voir dire to ferret out such relationships,

and to develop the extent to which the juror's ability to be impartial in the particular case is actually, or presumptively, affected. For those revelations that occur during voir dire, the remedy is a cause challenge; for those that occur during trial, the remedy is a contemporaneous proceeding during which the trial court can preserve the integrity of the jury; for those that occur after trial, the remedy is a post-trial hearing. Here, the evidentiary hearing showed no actual effect of his wife's experience, or of their conversations, on Hilliard's ability to be fair and impartial.[11] Being the spouse of a rape victim is not, in and of itself, such an "extreme" or "extraordinary" situation that it should automatically disqualify one from serving on a jury in a case that involves rape.[12] It cannot be said that the average person in Hilliard's position would be highly unlikely to remain impartial whether he acknowledged it or

---

[11]We note that this determination may depend upon testimony of the juror in question. *See, e.g.*, *Phillips*, 455 U.S. at 217 (rejecting argument that a court cannot possibly ascertain the impartiality of a juror by relying solely upon the juror's testimony but must instead impute bias to jurors in the questioned juror's position); *Dennis*, 339 U.S. at 171 (observing that "[o]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of the oath is well qualified to say whether he has an unbiased mind in a certain matter").

[12]*See United States v. Powell*, 226 F.3d 1181, 1189 (10th Cir. 2000) (holding that juror whose daughter had been raped was not impliedly biased in trial concerning kidnaping for sexual gratification and assault); *cf. Gonzales v. Thomas*, 99 F.3d 978, 989-90 (10th Cir. 1996) (declining to hold that a rape victim can never be an impartial juror in a rape trial as it would "insult not only all rape victims but also our entire jury system, which is built upon the assumption that jurors will honestly try 'to live up to the sanctity of [their] oath' ") (quoting *Dennis*, 339 U.S. at 171). *See also Jones v. Cooper*, 311 F.3d 306, 312-13 (4th Cir. 2002) (refusing to presume bias from the fact that juror's relatives had been arrested and tried); *United States v. Torres*, 128 F.3d 38, 46 (2d Cir. 1997) (declining to hold that bias must be implied where juror has engaged in conduct similar to that of the defendant at trial). *But see Hunley v. Godinez*, 975 F.2d 316, 320 (7th Cir. 1992) (holding that burglary of sequestered jurors that occurred during their deliberations concerning a similar burglary charge was an extreme situation justifying presumption of bias).

not.[13] Rather, the effect of the spouse's experience on the juror's impartiality depends on purely personal considerations that can vary from case to case, including, for example, the similarity of the spouse's experience to the facts of the case, the nature of the experience, its contemporaneous and continuing impact, the couple's relationship, how the individual handles it, and so forth. Given Hilliard's honest response on voir dire that revealed a potentially disqualifying relationship, but not an extreme or extraordinary one, and the results of the evidentiary hearing which disclosed no actual bias, we see no basis for inferring bias now as a matter of law.

C

[11] Our conclusion that Hilliard was an impartial juror remains the same whether conversations with his wife during trial are considered together with his voir dire responses, or separately from them. However, the conversations occurred after the jury was sworn and so are analytically distinct from his responses on voir dire.[14] These conversations obviously

---

[13]Relying on *Tinsley,* Judge Berzon's dissent says that this observation "is quite beside the point," and that in fact the "struggle *during* the trial over whether Diane Hilliard could attend" is "critical in assessing the implied bias issue in this case." Berzon dissenting op. at 12036. But *Tinsley* made the inherent nature of the relationship precisely the point for purposes of the implied bias doctrine — not, as the dissent would have it, whether some kind of "struggle" actually took place while the trial was ongoing. 895 F.2d at 527 (focusing on *the relationship*). Whether some kind of "struggle" took place is an individualized, subjective inquiry appropriate to the question of whether prejudicial ex parte communications or extrinsic information infected the partiality of the jury, but it is *not* germane to whether bias inheres in a particular relationship between the juror and the litigation such that bias must be presumed (which is an objective inquiry). Regardless, even if a struggle during trial were somehow "critical," there was no struggle that juror Hilliard participated in. The evidentiary hearing resolved *that* issue.

[14]Judge Berzon's conclusion to the contrary collapses the distinct concepts of implied bias — which arises intrinsically from an "extreme" and "extraordinary" relationship between a juror and an aspect of the litigation

could not have been disclosed or discovered during voir dire as they took place afterwards. Nevertheless, discussions between Hilliard and his wife could bear on Hilliard's impartiality, or they could amount to an impermissible private communication between a juror and a third person that, under *Mattox v. United States*, 146 U.S. 140, 150 (1892), and *Remmer v. United States*, 347 U.S. 227, 229 (1954), would invalidate the verdict unless the communications were deemed harmless.

Fields argues that the fact that Hilliard knew his wife seriously entertained the notion that Fields might have been her assailant (regardless of his own views of the matter) made it impossible for him to exercise independent judgment. Thus, in Fields's view, the conversations gave rise to a presumption of prejudice that was not rebutted. Fields also urges that Hilliard evinced an "excess of zeal" to stay on the jury, thereby manifesting a lack of impartiality. However, these arguments fail in light of the district court's findings. The court found Hilliard credible, which means that he did not discuss the Fields trial with his wife beyond saying what kind of case it

---

— and ex parte communication with, or extrinsic influence on, a juror. Berzon, J., dissenting op. at 12036. To do so creates a novel, hybrid category of implied bias that goes well beyond anything heretofore recognized. While *Teague* is not implicated by the doctrine of implied bias of the sort noted by Justice O'Connor's concurrence in *Phillips*, 455 U.S. at 222-23 & n.*, *Teague* may be implicated by a new concept of bias cobbled out of *a* relationship *plus* alleged ex parte communications. Beyond this, Judge Berzon's approach fails to recognize that the remedy for allegations of juror partiality stemming from events such as ex parte communications and extraneous information is an evidentiary hearing at which the defendant has the opportunity to prove actual bias. *See, e.g., Remmer v. United States*, 347 U.S. 227 (1954); *Phillips*, 455 U.S. at 216; *Dennis*, 339 U.S. at 171-72; *Williams*, 529 U.S. at 442-44; *United States v. Madrid*, 842 F.2d 1090, 1094 (9th Cir. 1988) (citing these authorities and reiterating the point in connection with alleged ex parte contact during deliberations). Fields had such an opportunity, but failed to show actual bias or prejudice.

was, he did not buy his wife's speculation about Fields's being her assailant, he did not confuse the Fields case with the crimes against his wife, and he discussed nothing with his wife that affected his ability to be fair and impartial.

Also as shown by the evidentiary hearing on remand, when Diane Hilliard asked her husband about the case, he told her he was not at liberty to discuss it. She knew only that her husband was a juror on a case involving a young, African-American male who had abducted and shot someone. She did not know if Fields's case involved rape charges. The district court found that Hilliard never confused the crimes against his wife with those that Fields committed, and he obeyed the trial judge's instruction not to discuss the case until it was over. Further, Hilliard truthfully told the judge he would decide the case on the evidence and the law given at trial, and nothing else, and absolutely did so. Finally, the district court found that the discussions did not delve deeply, if at all, into the facts of Fields's case and that Hilliard's discussions with his wife did not affect his ability to be fair and impartial.

[12] It is Hilliard's impartiality that matters, not his wife's. As found by the district court, the two had no discussions during trial about its subject matter that affected Hilliard's ability to be fair and impartial. Thus, the communications were harmless.

## III

In a related claim, Fields alleges that his counsel was ineffective in failing to question Hilliard during voir dire about the attack on his wife or about his ability to serve impartially. To prevail under *Strickland v. Washington*, 466 U.S. 668 (1984), Fields must show that his "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. As the panel observed in *Fields II*, "it is tough to imagine why [Fields's counsel] did not pursue what kind of assault Hilliard's wife suffered, given that the non-

capital charges against Fields included rape." 309 F.3d at
1108. The state hypothesizes tactical reasons why Jones
would have wanted Hilliard on the jury, but whether counsel
had a strategic reason is immaterial, for Fields was not preju-
diced. *Strickland*, 466 U.S. at 697 (observing that a court may
determine prejudice without first deciding deficiency). Preju-
dice exists if "there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different." *Id*. at 694. Here there is no such
reasonable probability, because Hilliard was not biased. The
impartiality of the jury was not undermined by his being
seated as a juror. Replacement of one unbiased juror with
another unbiased juror should not alter the outcome.

**[13]** As other claims having to do with the guilt phase have
been resolved and are not before us, and we now resolve the
juror bias issues in favor of the state, we affirm the judgment
denying habeas relief on all claims related to Fields's convic-
tion.

IV

The state cross-appeals the district court's grant of the writ
on Fields's claim of misconduct based on the jury's use of
Biblical quotations and dictionary definitions in the penalty
phase. It presses four reasons for error: the claim is not timely
under Rule 9(a) of the Rules Governing Section 2254 Cases
in the United States District Courts; the claim is *Teague*-
barred; the district court's finding was based on juror declara-
tions that are inadmissible under Federal Rule of Evidence
606(b); and the jury's consideration of the Biblical passages
and dictionary definitions did not violate the Constitution or
have a substantial and injurious effect on the verdict. Fields
responds that his rights to cross-examination, confrontation,
and the assistance of counsel were violated by use of Juror
White's notes because he had no chance to take a position on
them. He submits that there is a material difference between
a juror's commenting on the evidence from general knowl-

edge that other jurors can easily rebut, and a jury's considering written notes of religious mandates and appeals to a higher authority. And he contends that the Biblical verses were "strong medicine" that supported imposition of the death penalty when the jurors were split in favor of life without the possibility of parole, thus were prejudicial.

The penalty phase of Fields's trial commenced on July 16, 1979, lasted less than a day, and the jury deliberated from 2 p.m. until 4 p.m. without reaching a verdict. That evening, Rodney White, the foreperson of the jury, checked the Bible and other reference texts and made notes "for" and "against" imposition of the death penalty which he brought to the deliberations the next day.[15] White also consulted a dictionary for

---

[15]The "for" side notes:

- "placate gods"

- "eye for eye"

- "deterrence"

- "Fitting punishment to crime"

- "Rights of victim"

- "Duty of the state to protect citizens"

- "Biblical"

    "Genesis 9:6 'Whoso sheddeth man's blood by man shall his blood be shed, for in the image of God made He man' "

    "Exodus 21:12 'He that smiteth a man, so that he dies, shall surely be put to death' "

- "Possibility of Repeated offenses"

- "Murder = a rejection of the values of society"

- "*New Test*"

    "Romans 13:1-5 'Let everyone be subject to the higher authorities, for there exists no authority except from God, and those who exist have been appointed by God. Therefore, he who resists the authority, resists the ordinance of God; and they that resist bring on themselves condemnation

definitions of the words "extenuation," "vindication," and "mitigate," and brought these notes to the jury room as well.[16]

> 'For rulers are a terror not to the good work but to the evil. Dost thou wish, then, not to fear the authority?
>
> 'Do what is good and thou will have praise from it. For it is God['s] minister to thee for good. But if thou dost what is evil, fear, for not without reason does it carry the sword. For it is God's minister, an avenger to execute wrath *on* him who does evil. Wherefore you must needs be subject, not only because of the wrath, but also for conscience's sake.' "

- "Luther, Calvin, Aquinas felt this to be supportive of capital punishment" and

- "Per Paul's letter to Romans: State has power for two reasons — 1. Satisfy demand's [sic] of God's service [and] 2. Protect society by deterring future crime."

The "against" side notes:

- "No real deterrent value—mostly because murderers not normal"

- "Question of 'Just'—There is no simple, 'just,' penalty"

- "Discriminatory selection"

- "Human fallibility—Perhaps wrong chap convicted."

- "Rehabilitation"

- " 'Popular' feelings"

[16]The notes were:

Extenuation — *to thin out* — palliation, softening, whitewash, gloss over, varnish, loophole, make allowance for

Vindication — justifiable, excusable, inculpable, blameless, legitimate not blameworthy . . . vindicable/extenuating

"The proper object of extenuate in its sense of making excuses for is a word expressing something bad in itself, as guilt, cowardice, cruelty — *not* a neutral word such as conduct or behavior — circumstances [sic]

"The meaning of excuse should *not* attach to *extenuate*, the word." VA [sic] Fowler

The notes were shared or the information was received by at least some jurors when deliberations resumed at 9:30 a.m. on July 17th. By 3 p.m. that afternoon, the jury had reached a verdict.

Fields presented a number of juror declarations in support of his claim of juror misconduct. Juror testimony about consideration of extrinsic evidence may be considered by a reviewing court, but juror testimony about the subjective effect of evidence on the particular juror or about the deliberative process may not. *See, e.g.*, *Sassounian v. Roe*, 230 F.3d 1097, 1108-09 (9th Cir. 2000) (relying on a long line of precedent drawing this distinction). On the state's motion, the district court struck the declarations to the extent that the information contained in them was inadmissible under Rule 606(b).[17] However, based on what was left, the court found that the religious material in White's notes was actually received by the jury, was available to it on the second day of deliberations, was discussed by some jurors, was presented at

---

Mitigate — soft, smooth, gentle, mild. *abate*, lessen, allay, attenuate, weaken, reduce, render or cause to be less, less harsh[,] decrease, diminish, decrease, curtail quality, limit, narrow, assuage.

[17]Rule 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

an early stage of deliberations before a verdict was reached, and directly related to a material aspect of the case because the references indicated that the death penalty should be imposed in any case involving murder. The district court concluded that the jury's consideration of Biblical references offended the principle that religion may not play a role in the sentencing process, and that it had the potential to be highly prejudicial.

**[14]** Before turning to the merits, we must first decide whether this claim is *Teague*-barred. *See Caspari*, 510 U.S. at 389; *Leavitt*, 383 F.3d at 816. The state's position is that as of the time Fields's sentence became final, law binding on state courts allowed the jury to exercise " 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty [under the state statute].' " *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)). The state also points out that as of that date, it was established law that a capital jury "express[es] the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). While these propositions are undoubtedly so, and there is no Supreme Court authority on Biblical references in the jury room, it is also true that as of 1984 it was well established "in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. 140, 149 (1892). The district court's ruling cannot be *Teague*-barred at this level of generality.

In addition, we have been unwilling for *Teague* purposes to require a case "involving identical facts, circumstances, and legal issues." *Keating*, 191 F.3d at 1061 n.11. The Sixth Amendment inquiry in the context of outside influence on a jury is fact-specific. Among other things, it requires a reviewing court to determine whether the particular materials that a

juror brought into the jury room are extraneous materials, or are merely "the kind of common knowledge which most jurors are presumed to possess." *Rodriguez v. Marshall*, 125 F.3d 739, 745 (9th Cir. 1997), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 828-29 & n.11 (9th Cir. 2002) (en banc); *see also Grotemeyer v. Hickman*, 393 F.3d 871, 878-79 (9th Cir. 2004) (stating that a juror's sharing her own experience as a physician with the jury is not extrinsic evidence); *United States v. Bagnariol*, 665 F.2d 877, 888 (9th Cir. 1981) (discounting claim of prejudice where extraneous information was something "any reasonable juror already knew"). We also apply a multi-factor test,[18] which makes it

---

[18]Factors we have identified for courts to consider in determining whether jury exposure to facts not in evidence deprives a defendant of his Sixth Amendment rights to confrontation, cross-examination and assistance of counsel include:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of . . . whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

*Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995) (alterations in original) (quoting *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)). Judge Berzon's dissent truncates prong five so as to suggest that there is no harmless error standard — and implies that the truncated version has been our court's test for "more than two decades." Berzon, J., dissenting op. at 12020. In fact, the dissent's quotation of the five-factor test is taken from *Bayramoglu*, prong five of which was corrected in *Lawson* to take account of *Brecht v. Abramson*, 507 U.S. 619 (1993). Thus, the truncated quote in the dissent reads: "(5) any other matters which may bear on the issue . . . ." whereas the true version of prong five states: "any other matters which may bear on the issue of . . . whether the introduction of extrinsic material [substantially and injuriously] affected the verdict." *Lawson*, 60 F.3d at 612 (alterations and ellipses in original).

Other facts we have considered that might suggest the potential prejudice of extrinsic information is diminished in a particular case include:

particularly difficult to conclude that the law applicable to a discrete set of circumstances was dictated by precedent.

[15] The core principle is well-settled: evidence developed against a defendant must come from the witness stand. In *Mattox*, the bailiff remarked to jurors while they were deliberating that the defendant had killed someone else, and a newspaper article injurious to the defendant was brought to the jury room and read. In this context, the Court articulated the now-familiar rule that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox*, 146 U.S. at 150. *Remmer* applied the rule to allegations of bribery. *See* 347 U.S. at 228-30. In *Turner v. Louisiana*, 379 U.S. 466, 473-74 (1965), jurors had continuous and intimate contact with two key government witnesses. The Court also held in *Parker v. Gladden*, 385 U.S. 363, 363-64 (1966), that the defendant's Sixth Amendment rights were violated where the bailiff told a juror the defendant was a "wicked fellow" and that if there were anything wrong in finding the defendant guilty, the Supreme Court would fix it.

We have found improper influence in similar circumstances, for example, when a juror received a threatening telephone call at home, *United States v. Armstrong*, 654 F.2d

[1] whether the prejudicial statement was ambiguously phrased; [2] whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; [3] whether a curative instruction was given or some other step taken to ameliorate the prejudice; [4] the trial context; and [5] whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Sassounian*, 230 F.3d at 1109 (alterations in original) (internal quotation marks omitted) (quoting *Jeffries v. Wood*, 114 F.3d 1484, 1491-92 (9th Cir. 1997)).

1328, 1331-33 (9th Cir. 1981); when the jury learned that the defendant had committed a prior armed robbery, *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993); when a juror told others about the defendant's reputation for violence, *Lawson*, 60 F.3d at 612-13; when the jury discussed an extra-record telephone call that directly related to the defendant's motive, *Sassounian*, 230 F.3d at 1108-10; and when a detective who provided crucial testimony had a twenty-minute conversation, factually unrelated to the trial, with three jurors during a recess, *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 696, 698 (9th Cir. 2004).

White's notes are not like these examples. They are a mix of ideas "for" and "against" capital punishment. Both the Biblical verses and the other concepts contained in the notes are notions of general currency that inform the moral judgment that capital-case jurors are called upon to make. As Justice Stevens put it, "[w]hile the question of innocence or guilt of the offense is essentially a question of fact, the choice between life imprisonment and capital punishment is both a question of underlying fact and a matter of reasoned moral judgment." *Sawyer v. Whitley*, 505 U.S. 333, 370 (1992) (Stevens, J., concurring in the judgment). White's "for" notes all exposit well-known themes. So do his "against" notes. In effect he marshaled general, commonly known points in favor of the death penalty — "eye for eye," "deterrence," "fitting punishment to crime," "rights of victim," and the Bible says so — along with general, commonly known points in opposition — "no real deterrent value," "there is no simple, 'just,' penalty," "discriminatory selection," "rehabilitation," and "perhaps wrong chap convicted." Fields nowhere suggests that White was not free to recite these points, including those from the Bible, or to resort to their reasoning. *See McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir. 1997) (noting that " '[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room' " (quoting *Hard v. Burlington*

*N. R.R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989))); *Burlington*, 870 F.2d at 1462 (denying new trial where one juror used personal knowledge of x-ray interpretation to sway others because "[i]t is expected that jurors will bring their life experiences to bear on the facts of a case"); *see also Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006) (noting that the jury's discussion of the practical effect of imposing a sentence of life without parole does not constitute reversible error, and holding that considering the sentences' comparative costs doesn't either). It is difficult to see how sharing notes can be constitutionally infirm if sharing memory isn't.

Fields correctly points out that we have held it is improper and prejudicial for the *prosecution* to invoke God or to paraphrase a Biblical passage in closing argument in the penalty phase of a capital case. *See Sandoval v. Calderon*, 241 F.3d 765, 776-77 (9th Cir. 2000). However, the prosecutor is constrained in ways that a juror is not. In *Sandoval*, as we explained, the prosecutor's argument frustrated the purpose of the closing argument, which is to review the evidence presented at trial that is relevant to the jury's decision as defined by the instructions given by the court. *Id.* Also, the prosecution's invocation of "higher law" or extra-judicial authority violated the Eighth Amendment principle of narrowly channeled sentencing discretion. *Id.* Further, we noted that argument involving religious authority undercuts the jury's own sense of responsibility for imposing the death penalty. *Id.* at 777. None of these considerations applies in similar fashion to a juror; what may be improper or prejudicial when said by a prosecutor may not be so when said by a juror.

**[16]** That said, we do not need to decide whether there was juror misconduct because even assuming there was, we are persuaded that White's notes had no substantial and injurious effect or influence in determining the jury's verdict. *Sassounian*, 230 F.3d at 1108 (applying *Brecht*[19] standard on

---

[19]*Brecht*, 507 U.S. at 623 (adopting standard for determining whether error was harmless).

habeas review of claim that jury considered extrinsic evidence.[20] Whether or not White should have brought his notes to the jury room and shared them,[21] we cannot say that the Biblical part of the "for" part of the notes had a substantial and injurious effect on the verdict. His own notes had an "against" part as well. So far as we can tell, the communication occurred early on in deliberations. Jurors could take as much time as they needed to sort through the evidence and

---

[20]Judge Berzon's dissent posits that under *Lawson*, "the relevant constitutional question" is whether " 'even a single juror's' vote was 'improperly influenced.' " Berzon, J., dissenting op. at 12020. While it is certainly correct that the Sixth Amendment right to an impartial jury is violated by the presence of a single improperly influenced juror, *Lawson*, 60 F.3d at 613, Fields must nevertheless show that the extrajudicial information had a substantial and injurious effect on the verdict under *Brecht*.

[21]The arguments on both sides of the issue are well set out in the majority and dissenting opinions in the Fourth Circuit's decision in *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006) (holding that state court did not act unreasonably in determining that the jury's reading of Bible passages during sentencing deliberations in a capital case did not violate the petitioner's Sixth Amendment rights), together with a concurrence in the denial of rehearing en banc by Judge Wilkinson reported at 444 F.3d 225 (4th Cir. 2006) (suggesting that juries be instructed to avoid discussing the Bible as a source of authority for decision making). We also acknowledge the California Supreme Court's recent opinion in *People v. Williams*, 40 Cal. 4th 287, 305-09 (2006), which held that reading several verses from the Bible, including Romans, Chapter 13, 1-4, although misconduct, was not inherently and substantially likely to have influenced the jury under California law.

Judge Berzon's dissent claims that "federal and state appellate courts generally agree when engaging in de novo review, that a jury engages in the unconstitutional consultation of extrinsic material by introducing the Bible into deliberations during a capital trial." Berzon, J., dissenting op. at 12011. For this proposition the lead (and only federal) citation is *McNair v. Campbell,* 416 F.3d 1291, 1308 (11th Cir. 2005) (recognizing "it is undisputed that jurors . . . considered extrinsic evidence during their deliberations" when the jury foreperson read aloud from a Bible), *cert. denied*, 126 S. Ct. 1828 (2006). However, the court in *McNair* held that the issue was procedurally defaulted, stated that even if it weren't there was no prejudice, and made the remark quoted in the parenthetical as a statement of fact.

reflect on whether the ultimate penalty was the right penalty.[22] More importantly, the jury was instructed to base its decision on the facts and the law as stated by the judge, regardless of whether a juror agreed with it. We presume that jurors follow the instructions. *Kansas v. Marsh*, 126 S. Ct. 2516, 2528 (2006); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (applying "the almost invariable assumption of the law that jurors follow their instructions").

**[17]** The aggravating evidence is powerful, as all judges who have reviewed the record have remarked. In Justice Broussard's summary for the California Supreme Court,

---

[22]Judge Gould's dissent speculates that "White's Bible quotations and passages were a catalyst in convincing the jury to vote for a death sentence," Gould, J., dissenting op. at 11998, however this trenches into territory precluded by Rule 606(b). A long line of authority makes clear that a court may not consider whether an outside influence *caused* a juror to change his vote; the question of prejudice from extrinsic information is an objective one, not a subjective one. *See, e.g., Sassounian,* 230 F.3d at 1108-09 (citing cases); *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988) ("the question of prejudice is an objective, rather than a subjective, one"); *United States v. Bagnariol*, 665 F.2d 877, 884-85 (9th Cir. 1981) ("Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts."); *Rushen v. Spain*, 464 U.S. 114, 121 n.5 (1983). Judge Berzon's dissent similarly relies upon the district court's statement that "a majority of the jurors favored a verdict of life without the possibility of parole until the jury discussed the Biblical references." Berzon, J., dissenting op. at 12016. However, the only support for this statement is the Declaration of Delores Henry, which — even assuming it may properly be considered — states only that "there were several jurors, including herself, who favored an LWOP sentence." Nowhere does she say (again, even if it could properly be considered, which it cannot be) that she changed her mind on account of White's notes. What the record shows is that White shared his notes with at least some jurors around 9:30 in the morning and that the jury reached a unanimous verdict around 3:00 p.m. Of course that means that the verdict was reached "after" White shared his notes, but there is no basis for surmising a causal link between the two.

assessing prejudice under *Strickland* and concluding there was no possibility of it:

> [A]side from cases of multiple murder, this was one of the more aggravated cases to come before this court. Defendant had previously been convicted of manslaughter. He embarked on his "one man crime wave" immediately after being released from prison. He kidnapped the murder victim and took her to his house where witnesses saw her, naked and bound, in defendant's bedroom. He forced her to write a check for the balance of her bank account. He later shot and killed her, apparently because she had written a check for less than the full balance. Defendant and a companion then stole a car at gunpoint, kidnapped two prostitutes, raped them both, and severely beat one of them. They then kidnapped another woman, stole her car, and took her to defendant's house, where defendant raped her and attempted to get money from her bank account. Thus the jury heard evidence not only of a murder, but also of a pattern of criminal behavior which, within the short period of three weeks, included at least three kidnappings, rapes, and robberies. We recognize, as habeas corpus counsel points out, that murders with special circumstances are generally horrifying crimes, but that juries nevertheless return verdicts of life imprisonment without possibility of parole in more than half the cases. But we think that even within this limited sphere of reference, this case is among the most aggravated.

*In re Fields*, 51 Cal. 3d 1063, 1079-80 (1991) (internal citation omitted). Given this, we see no prejudicial constitutional error on account of the juror's notes that requires issuance of the writ.[23]

---

[23]For this reason we do not reach the state's remaining arguments for reversal.

**[18]** Dictionary definitions for terms used in the instructions directly implicate the law given by the court by which the jury's decision must be determined. If a jury needs help with the instructions, the proper thing to do is ask the judge. Misconduct though it was to research these definitions, and for the jury to review them, we cannot say that the jury's consideration of the definitions on White's notes had a substantial and injurious effect or influence in determining the verdict in this case. Fields has shown no influence whatsoever, and none is apparent to us. Accordingly, the misconduct is harmless.[24]

V

We hold that Fields was not deprived of an impartial jury and therefore the district court's judgment on his conviction is affirmed. We also conclude that juror misconduct, assuming it occurred during the penalty phase, had no substantial or injurious effect on the sentence. To this extent, the district court's judgment is reversed.

AFFIRMED IN PART; REVERSED IN PART.

---

[24]Fields also raised a number of issues having to do with the penalty phase, but we abide the panel's disposition as to them. Accordingly, we reinstate Parts IV and V of *Fields III*, 431 F.3d at 1199-1206.

GOULD, Circuit Judge, with whom MCKEOWN and WARDLAW, Circuit Judges, join, concurring in part and dissenting in part:

I concur in Sections I, II, and III of Judge Rymer's majority opinion insofar as it rejects the bias claims urged by Fields as grounds for habeas relief from his conviction. I respectfully dissent, however, from the majority's analysis in Section IV of the challenged introduction by the jury foreman of written biblical quotations and notes "for" and "against" capital punishment. I disagree with the majority's decision not to decide if this extraordinary appeal of the jury foreman to "higher law" of the Bible constituted jury misconduct. I also disagree with the majority's conclusion that the use of written Bible quotations and notes in this manner during jury deliberations did not have any substantial injurious effect on the jury deliberations and death sentence.

# I

It is error here to sidestep the issue of jury misconduct. It is well-settled that religion may not play a role in the sentencing process. *See e.g., Bennet v. Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996); *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir.

1998); *United States v. Giry*, 818 F.2d 120 (1st Cir. 1987), *cert. denied*, 484 U.S. 855 (1987). Appealing to the wisdom of the Bible, as admirable as it is in other contexts, is beyond doubt jury misconduct when the jury is given by the foreman written and selected quotations from the Bible, which were not introduced into evidence through a witness or subjected to cross-examination, to aid in and influence jury deliberations.

The Sixth Amendment's guarantees of a trial by an impartial jury and the right of confrontation require that the jury base its verdict on the evidence presented at trial. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965). "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. 140, 149 (1892). These rights apply equally to sentencing proceedings tried to a jury, as they do to guilt deliberations. *See Morgan v. Illinois*, 504 U.S. 719, 727-28 (1992).

In declining to decide if the introduction of biblical quotations and notes is juror misconduct, the majority argues that Bible verses are not similar to extrinsic materials that we and the Supreme Court have previously found prejudicial because they are "notions of general currency that inform the moral judgment" of capital-case jurors. *See supra* Section IV at 11983. This argument is unpersuasive.

To begin, the majority postulates that White's researched Bible verses and notes were "a mix of ideas 'for' and 'against' capital punishment." *See supra* Section IV at 11983. One need not be a biblical scholar to see that the list provided by the foreperson was slanted by his personal judgments and inclinations, and was intended to spur deliberations towards a sentence of death rather than life imprisonment. On shear numbers alone, White's Bible references in favor of the death penalty had at least thirteen separate entries, with over thirty-one lines of writing and several lengthy direct quotations from the Bible, including one quotation of thirteen lines of verse.

*See supra* Section IV at 11977-78 n.15. Conversely, the "con" side had no Bible quotations and a mere six entries on six written lines. Additionally, the "con" list was comprised of piecemeal ideas and thoughts, whereas the "pro" death penalty list contains numerous references to higher law from the Bible such as an "eye for eye" and " '[l]et everyone be subject to the higher authorities, for there exists no authority except from God.' " *See id.* Missing from the "con" list are biblical quotes that might have been marshaled against the death penalty. *See e.g., Romans* 12:17-19 (King James): "Recompense to no man evil for evil. Provide things honest in the sight of all men. If it be possible, as much as lieth in you, live peaceably with all men. Dearly beloved, avenge not yourselves, but rather give place unto wrath: for it is written, Vengeance is mine; I will repay, saith the Lord."; *Deut.* 21:18-21; *Exod.* 31:14-15. The extreme lopsided nature of the pro and con lists simply underscores the emphasis White placed on Biblical justification of the death penalty.

Moreover, I think it fanciful for the majority to say that the Bible quotations are merely "notions of general currency that inform the moral judgment that capital-case jurors are called upon to make." The majority claims that White's Bible quotations were all "well-known themes," and that he "marshaled general, commonly known points in favor of the death penalty." *See supra* Section IV at 11983. The majority does not say what percentage of the general public is familiar with each of these quotations, even if that were assumed to be valid. If these biblical verses are well known as "notions of general currency," why did White have to conduct research to produce them? It is one thing to say something is common knowledge when a person recites it from memory, but it is quite a different thing altogether to argue that a Bible verse is common knowledge when a person has to research the Bible, and write down text to remember it.

Certainly, the majority is not claiming that each and every word of the entire Bible is common knowledge? In this case,

White conducted independent research of the Bible and dictionary. He wrote down his results to present during jury deliberations the following day. Furthermore, White didn't simply jot down a few biblical catch-phrases, but instead he wrote down over seventeen lines of quoted text. Putting aside biblical scholars and persons capable of extraordinary memory feats, it is unlikely that for many persons seventeen lines of biblical text, and indeed thirteen consecutive lines from one quote, can be viewed as a "notion of general currency."

Moreover, even if these can be characterized sensibly as "notions of general currency," then are they notions that some jurors might view as divinely commanded or inspired? If these quotes from the Bible are "notions of general currency," then would the majority say that the same is true if the foreperson had brought in written quotations from other religious texts, whether those of Bhuddism, Hinduism, or Islam, or even of other religions that command smaller groups of adherents? As Judge Wilkinson of the Fourth Circuit emphasized in his concurring opinion in *Robinson v. Polk* (*Polk II*):

> Though many of its teachings are universal, the Bible nonetheless remains a sectarian text that serves as the theological foundation for certain religions and not others. If it could be brought into the jury room as a basis for discussion and debate upon the ultimate punishment the state may impose, it would be only a short while before jurors of different faiths brought their own holy texts into the conversation. The jury room is not the place to debate the respective merits of the Bible, the Koran, the Torah, or any other religious scripture that Americans revere, nor is it the proper forum for a clash between belief and non-belief. These discussions would likely be divisive, and might range far afield from the appropriate legal and factual inquiry. In a pluralistic America, the jury room must remain a place of common

ground firmly rooted in law, irrespective of deeply
and sincerely held religious differences.

444 F.3d 225, 227 (4th Cir. 2006).

If the majority's rule applies only to the introduction of
quotes from the Judaeo-Christian Bible, then this introduces
something akin to an Establishment Clause violation into the
heart of the jury room.[1] If quotes from the Bible are okay,
what if the foreman had brought in quotes from the Koran, or
from a particular fatwa, indicating that some terrorist act of
murder was okay under a different religious text. Surely it
cannot be our law that jury forepersons may urge action by a
jury in accord with written quotes provided from the Bible,
external to the evidence developed in the trial, but that jurors
cannot submit written statements from other religions to like
effect.

The idea of "notions of general currency" is one that the
majority does not even try to corral, and this is an idea that
will likely prove unworkable in practice when courts try to
delimit the scope of the majority's doctrine. Is it solely ethical
principles from the familiar Bible? Does it also include ethical
principles from other religions? Does it include ethical princi-
ples from philosophers?[2] Does it include street-corner wisdom

---

[1]*See Polk II*, 444 F.3d at 227 (Wilkinson, J., concurring) ("And the First
Amendment plainly illustrates that religion poses unique concerns within
our legal system. The Constitution does not, therefore, allow religious
considerations to replace legal ones."); *Shelly v. Kramer*, 334 U.S. 1, 20
(1948) ("The judicial action in each case bears the clear and unmistakable
imprimatur of the State."); *see also* Paul G. Kauper, *Civil Liberties and
the Constitution*, 141-52 (1st ed. paperback, The University of Michigan
Press 1966) (1962); Gary J. Simson & Stephen P. Garvey, *Knockin' on
Heaven's Door: Rethinking the Role of Religion in Death Penalty Cases*,
86 Cornell L. Rev. 1090, 1121 (2001); Terrence T. Egland, *Prejudiced by
the Presence of God: Keeping Religious Material out of Death Penalty
Deliberations*, 16 Cap. Def. J. 337, 356-66 (2004).

[2]In 1974, the late Professor Black from Yale University Law School
wrote *Capital Punishment: The Inevitability of Caprice and Mistake*, a

such as might be found in popular novels of any number of current authors whose books line the supermarket shelves?[3]

This is not merely a case presenting juror misconduct in introducing extrinsic evidence. It is worse because the evidence White introduced was that of a "higher law" from the Bible. The United States Supreme Court has labored for decades to set applicable rules for death penalty cases that constrain the exercise of discretion by jurors and that help ensure that when the death penalty is implemented it is based on law. That means that it is based on secular law, not on the law of God or of any particular juror's view of that law.

The "use by deliberating jurors of an extrajudicial code (not already embodied in their own characters) cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death must be the result of discretion which is carefully and narrowly channeled and circumscribed by the secular law of the jurisdiction." *Jones v. Kemp*, 706 F. Supp. 1534, 1559 (N.D. Ga. 1989). California's death penalty

---

piece urging the end of the death penalty and rehearsing arguments pro and con in it. Consider also, Mohandas K. Gandhi, *My Faith in Non-Violence*, *in* SOCIAL AND POLITICAL PHILOSOPHY 542 (John Sommerville & Ronald E. Santoni eds., Doubleday 1963) ("[W]herever you are confronted with an opponent, conquer him with love."). Could a jury foreperson or other juror bring written quotes from Professor Black's book pro and con on the death penalty? Perhaps Ghandi's teachings would be allowed? Introduction of these works, and others like them, would transform jury deliberations into a discussion of the merits of the death penalty. Yet, that debate, at least for United States legal purposes, has been put to rest, by the Supreme Court decision in *Gregg v. Georgia*, 428 U.S. 153 (1976).

[3]There is no shortage of popular authors who write on crime-related subjects, among these consider the many novels of Scott Turow, Dean Koontz, and others. Under the majority's rule, might the foreperson have summarized what Turow thinks, or what his fictional characters think, about the death penalty? Certainly some would say these authors press and post views of general currency in the world, and that is why they are best-selling authors.

statute provides specific factors the jury is to consider to distinguish "the few cases in which [the death penalty] is imposed from the many in which it is not." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (internal quotation marks omitted). Here, White introduced to the jury deliberations only Bible quotations that were pro death penalty, and left out Bible quotations that spoke to mercy. Moreover, the passages from which White quoted "explicitly reject[ ] the drawing of distinctions in murder cases," *Jones*, 706 F. Supp. at 1559-60, and directed the jury to impose death in any case involving murder. These Bible passages, commanding death, inserted "higher law" into the jury deliberations and unconstitutionally relieved the jury from their individual responsibility to determine whether to commit Fields to death or sentence him to life imprisonment. *See Polk II*, 444 F.3d at 227 (Wilkinson, J., concurring) (reasoning that the Bible's "place as a canon of scriptural authority is so powerful that it threatens to supplant the individualized sentencing inquiry into the nature and consequences of the crime and the particular aggravating and mitigating circumstances"); *People v. Harlan*, 109 P.3d 616, 631 (Colo. 2005) (reasoning that the Bible, as higher law, is very persuasive to a typical juror as it relieves "the juror from his or her individual responsibility to determine whether to commit a person to death because God commands that result").

Here, White introduced Biblical quotations and passages into the jury deliberations. The Bible quotations were circulated to, and discussed by, the jury collectively during its deliberations. White's introduction of extrinsic information, especially extrinsic religious precepts from the Bible, was juror misconduct. The Bible's presence in the jury room as a focus of deliberations, if I may borrow a phrase from Judge Wilkinson, crossed "the constitutional line." *See Polk II*, 444 F.3d at 226 27 (Wilkinson, J., concurring).

## II

White's sentence should be vacated if it is shown that the juror misconduct error "had substantial and injurious effect or

influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

The majority concludes White's introduction of Bible quotations and passages, and dictionary research was not prejudicial primarily because: (1) it presumed that the jury followed the trial court's instructions to base its sentence verdict on the facts and instructed law; and (2) Fields did not show influence on the jury, nor was it apparent to the majority opinion in light of Fields's heinous crimes. *See supra* Section IV at 11984-85.

As a general rule, we presume that jurors follow the trial court's instructions. *See Kansas v. Marsh*, 126 S. Ct. 2516, 2528 (2006). But here the conclusion is inescapable that the jury did not follow the trial court's instructions. The trial court charged the jury with determining whether to sentence Fields to death or life imprisonment, and instructed the jury to consider only the evidence presented at trial and the factors enumerated in California Penal Code § 190.3. The jury was not to consider external materials, including the dictionary or the Bible, during its penalty phase deliberations. But that is precisely what they did.

The majority admits that it was misconduct for the jury to disregard the trial court's instructions and research definitions in a dictionary. *See supra* Section IV at 11988. Yet, the majority presumes that the jury followed the trial court's instructions in reaching its penalty verdict after consulting and discussing the Bible quotations. *See supra* Section IV at 11986. What basis is there to presume, as the majority does, that after consulting both the dictionary and the Bible for aid in deliberations, that the jury members disregarded the secular and divine insights gleaned from these sources and based the sentencing decision on the facts and the law as stated by the trial judge. Indeed, just the opposite is likely. This jury proved it did not follow the trial court's specific and explicit instruc-

tions. Because of this, we should recognize that the jury disregarded the trial court's instructions and based their death sentence not only on the facts and law as stated by the judge, but also on the insight and independently researched support garnered from the Bible and dictionary.

The majority's prejudice analysis is wishful thinking. White's written researched Bible quotations and passages in favor of the death penalty were introduced to the jury at the start of the second day of deliberations. According to the district court, White's written Bible quotations were discussed, or made available to the jury, for about 70% of the total time the jury deliberated. The jury on an initial vote, before seeing these written Bible quotations, was more inclined to a life sentence than to death.[4] Given the authority of the Bible's "higher law," and the time White was able to advocate for the death sentence using these quotations, it is not a stretch to say objectively that White's Bible quotations and passages were a catalyst in convincing the jury to vote for a death sentence.

We have good reason to suspect that here the change in the jury's views probably were related to the misconduct. Considering that if only one juror had declined to sentence Fields to death the trial court would have been obligated to impose a life sentence, it is more probable than not that White's introduction of written researched Bible quotations into jury delib-

---

[4]The majority opinion correctly points out that under Federal Rule of Evidence 606(b) and our precedent we "may not consider whether an outside influence *caused* a juror to change his vote; the question of prejudice from extrinsic information is an objective one." *See supra* Section IV at 11986 n.22. Yet, my observation that a majority of jurors before seeing the written Bible quotations were favoring a life sentence without parole is not a subjective discussion on whether White's Bible quotations and extrinsic notes caused the jurors to change their votes. Rather, the court should recognize this fact as a starting point, similar to noting when White introduced his outside written research into the deliberations. These facts inform an objective analysis to determine if the introduction of White's improper Bible written quotations had a substantial and injurious effect or influence in determining the jury's verdict.

erations had a "substantial and injurious" influence on the jury's verdict. *Brecht*, 507 U.S. at 623.

One may only hope that the Ninth Circuit will eventually come to recognize that the majority opinion here errs by blinking over the serious jury misconduct that occurred in the penalty phase. The last thing that this country needs, and a thing inconsistent with our constitutional traditions and the paramount role of the jury in our criminal justice system, is to have a theocratic jury room in which a jury foreman can present the jury with notes compiled from the Bible with a selected "pro and con" on the death penalty in light of scripture. The majority fails to realize that a written appeal to "higher law" of the Bible in the jury room by tendering notes to the jurors that were not admitted in evidence or tested by cross-examination is inconsistent with the carefully wrought scheme by which the Supreme Court has held that the ultimate penalty of death can be meted out by a jury when the rules are followed. Fields's crimes are horrific, and it is not difficult to see that a jury might have decided that death was warranted. But the rules were not followed in the jury room in the penalty phase. Evidence or extrinsic material that was not admitted was summoned up by the jury foreman. This situation was made worse by the evidence or extrinsic material being of a religious nature that would unduly influence jurors. The majority's conclusion that any error was harmless is entirely speculative, for it seems probable that an absence of the marshaled biblical lore favoring death might have tilted at least one juror from seeking the retribution of a death penalty to embracing the mercy of life imprisonment.[5] The timing, the source of the external evidence or extrinsic material, the spec-

---

[5]I have observed in another context: "As Shakespeare reminded us: 'The quality of mercy is not strain'd, It droppeth as the gentle rain from heaven Upon the place beneath.' So too, in our analysis of prejudice, we must remind ourselves that the possibility of mercy, like the possibility of gentle rain, is not predictable with certainty." *Mayfield v. Woodford*, 270 F.3d 915, 938 (9th Cir. 2001) (Gould, J., concurring) (in part quoting William Shakespeare, *The Merchant of Venice*, act IV, sc. 1.).

ificity of the notes and the lopsided pro and con chart per-
suade me that the notes had a substantial and injurious
influence in determining the verdict. I respectfully dissent.

---

BERZON, Circuit Judge, with whom REINHARDT and
THOMAS, Circuit Judges, join, dissenting:

Stevie Lamar Fields was charged with capital murder. He
had the constitutional right to have twelve impartial jurors
decide under California law whether he had committed the
grave crime with which he was charged and, if so, whether he
should lose his life as a result. Instead, he was sentenced to
death by a jury whose foreperson brought into the jury room,
and placed before his colleagues for consideration, lengthy
Biblical quotations that clashed with the judge's instructions,
with California death penalty law, and with constitutional pre-
cepts governing sentencing in a death penalty case. And he
was convicted and sentenced to death by a jury containing one
juror whose personal circumstances, objectively speaking and
assuming an entirely good faith effort on his part to disregard
those circumstances, made it highly unlikely that he could be
the "impartial and indifferent" decisionmaker that "due pro-
cess alone has long demanded." *Morgan v. Illinois*, 504 U.S.
719, 727 (1992).

The federal district court held that Fields could not be con-
demned to death by a jury encouraged to rely on religious
texts rather than the judge's instructions as the basis for its
fateful decision. The majority of this en banc court, however
— after an exegesis that almost, but not quite, sanctions the
jury's collective recourse to lengthy quotations from the Bible
— somehow divines that Fields would have been convicted
and sentenced to death even if the jury had not consulted the
Bible's absolutist standards for imposing the death penalty.
The majority also concludes that we must accept as disposi-
tive a juror's assertions that he was able to disregard the close

resemblance between the unsolved kidnapping and rape of his wife not long before the trial and the crime with which Fields was charged. It does so even though the resemblance was so marked that the juror's wife became convinced that Fields could have been her assailant and tried repeatedly during the trial to convince her husband to let her attend the trial so she could tell whether he was.[1]

Following the order in which the district court addressed Fields's claims, I first examine the jury's use of extrinsic materials — principally, passages from the Bible — during penalty phase deliberations. I explain why the district court correctly determined that this action violated Fields's constitutional rights, and why the majority's lack-of-prejudice analysis disregards the unusual problems that inhere in making a prejudice determination with regard to the impact of external influences on jury deliberations. I then address why, in the unique circumstances of this case — which go far beyond the fact that a juror's wife was a rape victim and that Fields stood accused of rape — the challenged juror's "potential for substantial emotional involvement, adversely affecting impartiality" is palpable. *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990) (quoting *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977)) (internal quotation marks omitted). This is therefore "one of 'those extreme situations where the relationship between a . . . juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.' " *Id.* (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)).

## I.

Before proceeding to either discussion, however, I begin with some reflections about the complex vision of the role of

---

[1] I agree with the majority that Fields's jury misconduct and jury bias claims do not seek the retroactive application of law foreclosed by *Teague v. Lane*, 489 U.S. 288 (1989).

the jury in our legal system that underlies both sets of legal principles here applicable — those dealing with the sealing off of jurors from external influences once they are seated, and those dealing with juror bias or predisposition. Quite evidently, both sets of principles are grounded to some degree in a "black box" theory of the ideal jury: The perfect juror, on this posit, is a person who comes into court with all his or her reasoning processes intact, and no bias, predisposition, or prejudgment that would be an obstacle to fair decisionmaking. The perfect juror is then exposed only to that testimony, evidence, and argument the parties present and that the judge deems proper under the law, and is later told by the judge, and the judge alone, which legal principles to apply. Our paragon juror then limits his or her decision to that which was presented, that which was argued, and that which was instructed, generating a verdict pristinely insulated from all extraneous influences, internal and external.

But the "black box" theory of jury virtue is, quite obviously, far from the whole story. As the stress we place on obtaining a jury that represents a fair cross-section of a defendant's peers indicates, *see, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 530-31 (1975), we also recognize, and value, the diverse perspectives jurors of different professions, racial backgrounds, economic circumstances, residential areas, and political and religious views bring to the determination of guilt and innocence and even, as in this case, life and death. Jurors all cut from the same mold, we have come to believe, are less likely to engage in useful collective deliberations, in which the whole is greater than its parts. Put another way, if all unbiased jurors of average intelligence were likely to think the same way with the same input, if jury deliberations were like arithmetic or algebra, then we could do with one juror rather than many. But we don't, and we don't want to. *See Ballew v. Georgia*, 435 U.S. 223, 230-39 (1978) (holding that the Constitution requires criminal juries to comprise at least six members in part because a smaller size "leads to inaccurate fact-finding and incorrect application of the common sense of

the community to the facts," and because "the opportunity for meaningful and appropriate representation [of minority groups] does decrease with the size of the panels"); *see also Tinsley*, 895 F.2d at 528 (noting the foolishness of a doctrine that would categorically disqualify jurors from serving in cases in which their group affiliations might suggest a tendency toward a particular outcome (citing *United States v. Salamone*, 800 F.2d 1216, 1225 (3d Cir. 1986)).

Other considerations as well temper in our jurisprudence the "black box" approach to jury deliberations. Among the most important is the emphasis we place on the importance of the privacy of jury deliberations. Jurors who expect that their deliberative processes will be open for exposure and interrogation after the verdict is in are likely to pull punches — to say less than they mean, to keep their reasons to themselves and only pronounce bottom-line conclusions, and to fail to respond to points made by fellow jurors. *See McDonald v. Pless*, 238 U.S. 264, 267-68 (1915) ("But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. . . . If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.").

An additional consideration is, of course, the recognition that jurors are simply human beings and human beings are not perfect, whether in their recollection, their understanding of language, or their ability fully to understand their own motivations and reasoning processes. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984) ("The varied responses to respondents' question on *voir dire* testify to the fact that jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be

uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges."). Legal processes do have to come to an end, and litigants, while assuredly entitled to a fair trial, are not entitled to a perfect one. *See id.* ("To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.").

This constellation of ideals, competing values, and practical considerations has led to a nuanced set of procedures and standards designed to assure an "impartial and indifferent" jury without losing sight of the value of diversity of backgrounds, the need for insulating the jury's deliberative process in large degree from later inquiry, and the reality that human perfection is not likely any time in the near future. Those procedures include voir dire, designed to ferret out without unduly intrusive inquiry those individuals who have a connection to the *particular* case — to its parties, its facts, its legal standards — such that, consciously *or not*, that connection is simply too likely to be a barrier to a *fair* — not pristine but *fair* — consideration of the evidence, argument, and legal standards presented. They also include instructions to the jury forbidding them to discuss the case with anyone other than fellow jurors once seated and not to discuss the case with even fellow jurors before the instructions are given and the jury retires to deliberate. *See* CAL. JURY INSTR. CRIM. 0.50 ("You must not converse among yourselves, or with anyone else, including but not limited to, spouses, spiritual leaders or advisers, or therapists, on any subject connected with the trial, except when all the following conditions exist: (a) The case has been submitted to you for your decision by the court, following arguments by counsel and jury instructions; (b) You are discussing the case with a fellow juror; and (c) All twelve jurors [and no other persons] are present in the jury deliberating room." (brackets in original)). At the same time, only rarely do we insist that jurors must be cloistered altogether during trial, rather than going home to their communities —

and to the real possibility of exposure to media, to the opinions of friends and family, and to the opportunity to conduct investigations or legal inquiries beyond those available in the courtroom. And the accommodating jury procedures also include evidentiary limitations on inquiry into the jury's verdict once it issues — limitations that are not absolute, but which are designed to allow inquiry only into objective, external factors that may have interfered with the jury's functioning. *See* FED. R. EVID. 606(b) ("Upon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, [and] (2) whether any outside influence was improperly brought to bear upon any juror . . . .").

All three of these sets of procedures could be much more absolute if our commitment to the "black box" jury were rigid — which, as I have said, it decidedly is not. Yet, they all posit a limit beyond which an extreme departure from the ideal is unacceptable and will lead to reversal of a verdict. That limit is reached, in the most general of terms, when the circumstances of either one or more jurors or of the nature of the jury deliberations are such that we simply lose confidence that the verdict was reached on the basis of the facts, argument, and legal standards presented in the courtroom.

The majority places a great deal of its emphasis upon the considerable barriers we have erected, for very good reason as I have said, upon post-hoc inquiry into jury verdicts, and upon our encouragement of interchange among jurors based on their life experiences. In doing so, however, it loses sight of the fact that we have not let go of the conviction that there *are* circumstances in which the connection of a juror to the

*particulars* of a case is so great that an emotional rather than rational verdict is likely — and is likely whether the juror so recognizes or not — because, as the very juror in question in this case said, "you can never be sure what's in the back of your mind." And it also loses sight of the impermeable line we have set between drawing on one's life experience and active research of outside sources, with regard to the facts *or* to the legal standards that are to govern the case.

The distinctions drawn may appear fine, but they are established *and* they are the result of considered compromises reached over time between the competing considerations that govern jury deliberations, some of which I have suggested. To resolve this case on the basis of slogans — for example, the assertion that jurors bring their moral precepts to the jury room, or that we must believe jurors who say they can overcome any emotional relationship they have to the *particular* facts — is simply to disregard the careful balances struck in our case law, so to allow the all-important jury system to serve its critical purposes.

## II.

### A.

Before beginning penalty-phase deliberations, the jury was instructed that "[a]fter having considered all of the evidence in this case and having taken into account all of the applicable factors upon which you have been instructed,[2] you shall

---

[2]Those factors were:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . .

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

determine whether the penalty to be imposed on defendant shall be death or confinement in the State Prison for life without the possibility of parole." Nonetheless, after the first day of penalty-phase deliberations in Fields's trial, the jury foreperson, Rodney White, went home; consulted the Bible and a dictionary; wrote out three pages of notes — including verbatim copies of three Bible passages, Genesis 9:6, Exodus 21:12, and Romans 13:1-5, widely understood to advocate capital punishment; brought those notes into the jury room the next morning; and shared them with his fellow jurors.

We have consistently recognized that the Sixth Amendment prohibits jurors from introducing matters into deliberations not presented during the trial. *See Gibson v. Clanon*, 633 F.2d

---

(c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(f) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects [sic] of intoxication.

(h) The age of the defendant at the time of the crime.

(i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

CAL. PENAL CODE § 190.3 (1977).

851, 854 (9th Cir. 1980) (explaining that a jury's consideration of extrinsic material is a constitutional violation). Although our case law often refers to such misconduct as the jury's consultation of "extrinsic evidence" or "extraneous facts," we have explained that "[e]xtraneous-evidence cases involve not only the introduction of 'evidence' per se but the 'submission of "extraneous information" (e.g., a file or dictionary) to the jury.' " *United States v. Rosenthal*, 454 F.3d 943, 949 (9th Cir. 2006) (quoting *United States v. Madrid*, 842 F.2d 1090, 1093 (9th Cir. 1988)); *see also Marino v. Vasquez*, 812 F.2d 499, 502-03, 505 (9th Cir. 1987) (holding that consulting a dictionary definition for the meaning of "malice" constituted the consideration of extrinsic information). Instead, analysis of an extrinsic information claim depends on whether the outside information "pertain[s] to 'any fact in controversy *or* any law applicable to the case.' " *Madrid*, 842 F.2d at 1093 (emphasis added) (quoting *Rushen v. Spain*, 464 U.S. 114, 121 (1983) (per curiam)); *see also Thompson v. Borg*, 74 F.3d 1571, 1574 (9th Cir. 1996) ("Juror misconduct typically occurs when a member of the jury has introduced into its deliberations matter which was not in evidence *or in the instructions*." (emphasis added)).

Here, there is no question that the Biblical passages copied by White pertained to the key legal question before the jury at the penalty phase — whether death was the appropriate sentence for Fields's acts. As the district court correctly observed, several of the passages expressed an absolute command to execute murderers:

> The Biblical passages cited by Juror White were not general passages dealing with morality or the commonplace principle that capital punishment is permissible in the abstract in the Judeo-Christian ethical and religious tradition. The references directed the jury that the death penalty should be imposed in *any case* involving murder.

*Fields v. Calderon*, No. CV 92-0465 DT, slip op. at 15 (C.D. Cal. Jan. 18, 2000) (emphasis added) (citation and internal quotation marks omitted).

There is also no question that in their absolute nature, the Biblical passages contained in White's notes clashed with standards California law provided for making such decisions. The jurors were instructed to make their decision based on California's 1977 death penalty statute that detailed an individualized process for determining whether a defendant should be executed:

> After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section,[3] and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole.

CAL. PENAL CODE § 190.3 (1977). The California Supreme Court has held this statute "require[d] the jury to concentrate upon the circumstances surrounding both the offense and the offender." *People v. Jackson*, 28 Cal. 3d 264, 316 (1980), *overruled on other grounds by People v. Cromer*, 24 Cal. 4th 889 (2001). Accordingly, "religious doctrine, commandments or biblical passages" are "factors outside section 190.3." *People v. Sandoval*, 4 Cal. 4th 155, 193-94 (1992), *aff'd on other grounds*, 511 U.S. 1 (1994).

By introducing the absolutist Biblical commands into deliberations, White effectively suggested that the jury ignore the individualized sentencing process provided by state law and demanded by the federal Constitution. As we said in *Sandoval v. Calderon*:

---

[3]*See supra* note 2.

> [I]nvocation of higher law or extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict. The Biblical concepts of vengeance . . . do not recognize such a refined approach. Argument involving religious authority also undercuts the jury's own sense of responsibility for imposing the death penalty.

241 F.3d 765, 776-77 (9th Cir. 2001) (citations omitted);[4] *see also Robinson v. Polk*, 444 F.3d 225, 232 (4th Cir. 2006) (King, J., dissenting from the denial of rehearing en banc) ("In effect, this juror requested that his fellow jurors throw the individualized consideration required by the Constitution to the wind, for while the Constitution requires that the death penalty be imposed through structured discretion on only a narrow class of the worst murderers, the principle of 'an eye for an eye' licenses death as a punishment for any murder, a position rejected by the Supreme Court as contrary to the Constitution.").[5] Substantively, then, there is no doubt that the Bibli-

---

[4]I fail to understand the majority's claim that the jury's own decision to deliberate based upon the Bible is less violative of the constitutional requirement of narrowly channeled sentencing discretion or prohibition on undercutting the jury's sense of responsibility for imposing death than a prosecutor urging the same effect. Maj. op. at 11984. The ultimate substantive concern is how the jury actually deliberates, not who caused them to deliberate in an unconstitutional manner.

[5]In a closely related context, the Supreme Court has been emphatic that the Sixth Amendment guarantee to "the impartiality of any jury that will undertake capital sentencing" includes the guarantee that jurors will not simply vote to impose the death penalty for any murder. *Morgan*, 504 U.S. at 728. As a result, a death sentence is unconstitutional if the jury includes "even one" juror who "will fail in good faith to consider the evidence of aggravating and mitigating circumstances *as the instructions require him to do.*" *Id.* at 729 (emphasis added); *see also Wainwright v. Witt*, 469 U.S. 412, 422 (1985) (allowing a potential juror to be removed for cause when his voir dire answers suggest that "he refuses to follow the statutory scheme" and instead "might vote for death under certain personal standards" (emphases omitted)).

cal quotations introduced a set of standards that contradicted the ones the jury was supposed to apply in deciding whether Fields was to live or die.

As to the procedural propriety of consulting the Bible during deliberations, federal and state appellate courts generally agree when engaging in de novo review, that a jury engages in the unconstitutional consultation of extrinsic material by introducing the Bible into deliberations during a capital trial. *McNair v. Campbell*, 416 F.3d 1291, 1308 (11th Cir. 2005) (recognizing "it is undisputed that jurors . . . considered extrinsic evidence during their deliberations" when the jury foreperson read aloud from a Bible), *cert. denied*, 126 S. Ct. 1828 (2006);[6] *Jones v. Kemp*, 706 F. Supp. 1534, 1559 (N.D. Ga. 1989) (holding the use of a Bible by the jury constituted an impermissible "search for the command of extra-judicial 'law' from [a] source other than the trial judge"); *McNair v. State*, 706 So. 2d 828, 837 (Ala. Crim. App. 1997) (analyzing a jury's use of the Bible during deliberations according to the "well settled principle of law . . . [that] is fundamental to a fair trial . . . that jurors should consider only the evidence presented at trial" (quoting *Ex parte Troha*, 462 So. 2d 953, 954 (Ala. 1984)) (internal quotation mark omitted)); *People v. Danks*, 32 Cal. 4th 269, 308 (2004) (holding a juror engaged in misconduct by "bringing a copy of the [Biblical] passage into the jury room, and passing it around to the other jurors"); *People v. Harlan*, 109 P.3d 616, 629 (Colo. 2005) (holding the use of written Biblical materials in the jury room was improper under state law that prohibited "[e]xposure of a jury to information or influences outside of the trial process itself"); *State v. Harrington*, 627 S.W.2d 345, 350 (Tenn.

---

[6]The majority says that *McNair* referred to the Bible extracts as "extrinsic evidence" only "as a statement of fact." Maj Op. at 11986 n.22. The Eleventh Circuit so stated in a section called the "Merits," and after a lengthy paragraph setting out the standards applicable to assessing the impact of extrinsic evidence. *See McNair*, 416 F.3d at 1307-08. In context the "undisputed" comment is not simply a statement of the parties' positions but an indication that the point is so obvious as to be indisputable.

1981) (holding error occurred when "the jury foreman buttressed his argument for imposition of the death penalty by reading to the jury selected biblical passages"); *Lenz v. Warden of the Sussex I State Prison*, 593 S.E.2d 292, 298-99 (Va. 2004) (analyzing defendant's claim that a Bible was present in the jury room pursuant to the Supreme Court's test for improper extraneous jury contacts).[7] Although several of these cases involve the presence of a complete copy of the Bible in the jury room, making only certain portions available exacerbates, rather than ameliorates, the problem presented by the introduction of Biblical writings during jury deliberations. Here, for example, the selection leaves out Biblical passages that can be read as condemning the death penalty or as condoning mercy in some instances. *See* Dissent of Gould, J. at 11994-95 n.2.

Unable to rely on case law, the majority suggests that White's conduct was not misconduct because the notes "are notions of general currency that inform the moral judgment that capital-case jurors are called upon to make." Maj. op. at 11983. Initially, I note that the majority's observation would likely be challenged by tens of millions of Americans who view the Bible not as a collection of "notions" about moral principles, but as a repository of hard-and-fast imperatives that must direct daily life. *See Robinson v. Polk*, 438 F.3d 350, 374 (4th Cir.) (King, J., dissenting) ("[T]he majority ignores the fact that the Bible is an authoritative code of morality — and even law — to a sizable segment of our population."), *cert. denied* 127 S. Ct. 514 (2006). White's notes were therefore significant for their factual representation that *the Bible* contained such statements, apart from the moral philosophy that the statements themselves expressed.

---

[7]The Fourth Circuit has held that a state trial court did not contravene clearly established Supreme Court case law by refusing to consider a claim that jurors engaged in misconduct by reading from a Bible during deliberations. *Robinson v. Polk*, 438 F.3d 350, 363-64 (4th Cir.), *cert. denied*, 127 S. Ct. 514 (2006). The court noted, however, that "our answer could possibly be different on de novo review." *Id.* at 363.

In any case, I fail to understand why a distinction between extrinsic statements of general moral currency and other extrinsic materials has a legal bearing on this case. Although the majority suggests that the distinction is significant in this case because the jury in a capital trial is assigned the task of making a moral judgment, as I have explained, the absolute nature of Biblical materials introduced by White contravened the permitted role of moral considerations and instead violated the principle that capital sentencing must be individualized. Moreover, the moral nature of death penalty judgments does not allow religious considerations to be a proper matter for deliberations, rather than a factor jurors can privately contemplate in the course of undertaking their awesome responsibility. *See Robinson*, 444 F.3d at 227 (Wilkinson, J., concurring in the denial of rehearing en banc) ("There is a difference between a juror bringing a Bible into the jury room for personal strength and support and the jury as a whole reading and debating the biblical text as the basis for a life and death decision. Such a debate is constitutionally problematic. . . . If the presence of a Bible in the jury room drives the collective discussion, and renders a capital sentence the result of religious command, then in my view, an important line has been crossed.").

The majority also suggests that all the courts that have held consulting the Bible to be impermissible reliance on extrinsic material are wrong because the Biblical quotations White looked up, copied, and brought into the jury room were simply "general, commonly known points in favor of the death penalty," and "[i]t is difficult to see how sharing notes can be constitutionally infirm if sharing memory isn't." Maj. op. at 11983-84. But this suggested equivalence disregards the careful balance between the various precepts regarding jury deliberations I discussed at the outset. In fact, as *Morgan* makes clear, a juror who voted for the death penalty on the basis of the absolutist position sanctioned by the Biblical quotations White placed before his fellow jurors *would* violate his oath to follow California law. For quite separate reasons — princi-

pally, preservation of the privacy of jury deliberations and of the finality of jury verdicts — we would not allow inquiry into why any individual juror voted for the death penalty, or into statements made to others regarding why they should do the same. But that forbearance serves an independent interest; it does not sanction the disregard of the instructions.

There is a second reason why this case is not similar to ones involving a juror introducing an argument into deliberations based on his personal knowledge. In such cases, we have held that no misconduct occurred. *See Rodriguez v. Marshall*, 125 F.3d 739, 745 (9th Cir. 1997) (juror discussed difficulty he had "discerning and recalling objects while driving at freeway speeds"); *McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir.) (juror argued during deliberations that "a sentence of life without parole . . . wouldn't mean 'without parole' "), *vacated en banc in other parts*, 130 F.3d 833 (9th Cir. 1997); *Hard v. Burlington N. R.R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) (juror made arguments during deliberations based on his prior military experience interpreting x-rays). But these cases are based on the proposition that "the general knowledge, opinions, feelings, and bias that every juror *carries into the jury room*" are properly considered during deliberations. *Hard*, 870 F.2d at 1461 (emphasis added); *see also United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) ("[A] juror's *past personal experiences* may be an appropriate part of the jury's deliberations." (emphasis added)). As I have noted, the success of the jury system rests in large part on the coming together of these variations in background, perception, and point of view.

In this case, however, it is undisputed that White's notes were the product of overnight Biblical research, rather than of familiarity with the Bible that White already had at the outset of deliberations. The case law proscribing importation of external information places its all on the proposition that this distinction matters: *After* we choose jurors, we want the decision made on the basis of what went on in the courtroom, fil-

tered through the personalities, background information, and reasoning ability the jurors brought with them to court. But we do not approve of, and regard as misconduct, affirmatively gathering outside information. Further, the lengthy quotations, written down and passed around, conveyed a sense of authority quite different from a paraphrase or one line quotations spoken from memory, not least because they could be consulted repeatedly and outside of White's immediate presence. The written, lengthy quotations introduced tangibly an external exhortation, that God, or the authors of God's book — not just juror White — encouraged jurors to disregard the judge's instructions and vote for the death penalty no matter what. The majority, therefore, is wrong to portray this case as similar to "sharing memory," and this case does not raise the question of whether jurors act impermissibly by referring to their faith during deliberations. *See* Maj. op. at 11983-84.

**B.**

Ultimately, however, the majority equivocates about whether White engaged in misconduct, but holds that his actions did not prejudice Fields. In so doing, the majority ignores the indications deemed relevant by our established case law, and fails to appreciate the unique issues involved in examining an extrinsic information claim in the context of an attack on a jury verdict.

**1.** The district court determined that White's misconduct did prejudice Fields. Before so concluding, the court made critical factual findings concerning the introduction of the Biblical material into the jury room: The district court found that the introduction came at a time when the jury was divided on the proper sentence.

> [T]he jurors considered and discussed the Biblical references in their deliberations. Juror Henry stated that,

> the foreman brought to the deliberations pages of notes of citations from the Bible and other religious sources which he felt supported capital punishment. These notes were passed around to and discussed by the jury. It was only after we reviewed and discussed the notes that an unanimous decision in favor of death was reached.

> Juror Hilliard stated that, "[t]he jury foreman presented to us, and we discussed, information which he had brought from home, including excerpts from the Bible and definitions. It was after these discussions that we were able to reach a unanimous verdict in favor of recommending the imposition of the death penalty." Juror White stated that he "brought the notes to the penalty phase jury deliberations and the contents of these notes were discussed during our deliberations."

> Respondent has submitted declarations from several jurors in which they stated that they did not recall any discussion of the Bible or dictionary definitions. However, the declarations submitted by respondent confirm the Court's finding that Biblical references were provided by Juror White and discussed by the jury.

> . . .

> . . . [I]n this case, there is evidence that a majority of the jurors favored a verdict of life without the possibility of parole until the jury discussed the Biblical references.

*Fields v. Calderon*, slip op. at 13-14, 16-17 (second alteration in original) (citations omitted).

The district court quite properly considered the jurors' statements that the jury was undecided at the time the Biblical material was brought into the jury room and that unanimity came only after that point. Under Rule 606(b) of the Federal Rules of Evidence, federal courts can consider "juror testimony about the consideration of extrinsic evidence" but cannot consider testimony "about the subjective effect of evidence on the particular juror." *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). Here, the district court did not find that the discussion of the Biblical material was the reason that jurors changed their vote, but merely that vote changes occurred, and when. We have previously found it proper to consider the timing of shifts in jury votes relative to the introduction of extrinsic evidence. *See id.* at 1110; *Marino*, 812 F.2d at 505 & n.8; *see also Mattox v. United States*, 146 U.S. 140, 147-51 (1892) (holding, after examining the common law restrictions against impeaching verdicts through juror testimony, that the defendant should receive a new trial based on jury misconduct because admissible evidence demonstrated that "[t]he jury in the case before us retired to consider of their verdict on the 7th of October, and had not agreed on the morning of the 8th, when the newspaper article was read to them").[8]

Moreover, that White thought it necessary to bring the Biblical material into the jury room after an initial session of deliberations strongly suggests that the material could have had an impact on the jury. Presumably, White felt that reviewing the material at home had affected his analysis and thought it might have a similar impact on others if brought into the jury room. Why would he spend the time hand copying the material if the jury was close to a decision, in which case his work was likely to be for naught? *See Gibson*, 633 F.2d at 855 ("[T]he fact that at least two jurors believed that it was necessary to obtain more evidence is, by itself, an indication that

[8]The majority finds no fault with the district court's application of Rule 606(b). *See* Maj. op. at 11979.

there may have been a need to resolve some lingering hesitation or uncertainty.").

Also, quite aside from the time and manner in which this extrinsic information was introduced, its content had a clear potential to affect deliberations. We have previously observed that one of the Bible passage reprinted verbatim in White's notes — Romans 13:1-5 — is "commonly understood as providing justification for the imposition of the death penalty," and its invocation during the sentencing phase of a capital trial "cloak[s] the State with God's authority." *Sandoval*, 241 F.3d at 775, 779. We held in *Sandoval* that a prosecutor's allusion to that passage, in concert with other religious references, prejudiced a defendant's right to be sentenced according to the statutory scheme for imposing the death penalty. *Id.* at 778-80. *Sandoval* explicitly noted that the record did not disclose whether the jury actually considered the prosecutor's Biblical argument, but it nonetheless held that "we cannot assume that the prosecutor's religious argument did not persuade at least one of the jurors to change a vote for life to death." *Id.* at 779.

Notwithstanding the majority's attempt to frame a prosecutor's invocation of the Bible as more damaging than its actual entry into the jury room, Maj. op. at 11984, our case law and common sense dictate the opposite conclusion: A fellow juror's introduction of such material into the jury room has an *even greater* potential for a prejudicial effect, because the defendant is unable to mitigate the jury's consideration of the Bible as he can when the prosecutor brings it into the trial — for example, by tailoring his closing argument to account for the religious arguments or by insuring that the judge instructs the jury to consider only the relevant statutory factors. *See Gibson*, 633 F.2d at 854 ("[W]hen a jury considers facts that have not been introduced in evidence . . . the violation may be more serious than where these rights are denied at some other stage of the proceedings because the defendant may have no idea what new evidence has been considered. It is

impossible to offer evidence to rebut it, to offer a curative instruction, to discuss its significance in argument to the jury, or to take other tactical steps that might ameliorate its impact."). Moreover, we do not know whether any juror in *Sandoval* paid any attention to the prosecutor's Biblical references. But we do know that at least one juror in this case — White — was sufficiently concerned about what the Bible said about the death penalty to spend time copying out lengthy quotations and that other jurors reviewed the passages. So we have here direct evidence of an impact on the jury deliberations that was lacking in *Sandoval*.

Other courts have also recognized the specially prejudicial nature of a jury's consideration of Biblical material. One federal district court has held that a jury's consultation of a Bible during penalty phase deliberations "may be highly prejudicial to the defendant" because it represents "a source which 'would likely carry weight with laymen and influence their decision.' " *Jones*, 706 F. Supp. at 1560 (quoting *Wilson v. Kemp*, 777 F.2d 621, 626 (11th Cir. 1985)). Likewise, Colorado's Supreme Court has found prejudice from the introduction of the Bible into deliberations: "[A]t least one juror in this case could have been influenced by these authoritative passages to vote for the death penalty when he or she may otherwise have voted for a life sentence" because "[t]he Bible and other religious documents are considered codes of law by many in the contemporary communities from which . . . jurors are drawn." *Harlan*, 109 P.3d at 630-31.

**2.** Given the nature of the extrinsic information involved in this case and the manner in which it was received by the jury, the majority's reversal of the district court on no-prejudice grounds is inexplicable. In so ruling, the majority determines that the notes had "no substantial and injurious effect or influence in determining the jury's verdict" and holds this lack of impact precludes habeas relief pursuant to *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Maj. op. at 11984.

The Supreme Court's requirement in *Brecht* that habeas relief be granted only when an error has a "substantial and injurious effect" was derived from the harmless-error standard enunciated in *Kotteakos v. United States*, 328 U.S. 750 (1946). 507 U.S. at 623. *Kotteakos* explains our task in conducting this variety of harmless-error review:

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764-65; *see also Payton v. Woodford*, 346 F.3d 1204, 1218 (9th Cir. 2003) (en banc) (explaining that our *Brecht* inquiry must reflect the "greater need for reliability" in the death penalty context (quoting *Coleman v. Calderon*, 210 F.3d 1047, 1050 (9th Cir. 2000)) (internal quotation marks omitted)), *rev'd on other grounds sub nom. Brown v. Payton*, 544 U.S. 133 (2005). Where the contention is that the jury improperly considered extrinsic information, this *Brecht* inquiry must focus upon the extrinsic material's impact on *any* juror, because "even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict." *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995); *see also Sassounian*, 230 F.3d at 1110.

This circuit for more than two decades has relied on a five-factor test to determine in the habeas context whether extrin-

sic information is prejudicial. That test requires us to consider:

> (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue . . . .

*Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) (citing *Paz v. United States*, 462 F.2d 740, 746 (5th Cir. 1972)). I, like the district court, would hold that *all* of these factors point toward the prejudicial nature of White's notes.

First, there is no dispute that the material was actually received by the jury when its foreperson brought the notes into deliberations. Second, the notes entered the jury room at the start of the second day of deliberations, which meant the jury considered the Biblical material during the majority of the time it considered Fields's sentence — four-and-one-half of the six-and-one-half hours of deliberations. Third, the notes were available to all members of the jury, and several members of the jury submitted affidavits attesting to their presence in the jury room. Fourth, the material entered the jury room during the pivotal period when the sentence was far from settled. Fifth, "the extrinsic information directly related to a material issue in the case" — the proper sentence. *Lawson*, 60 F.3d at 612; *see also Marino*, 812 F.2d at 506 ("[R]eversible error commonly occurs where there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case.").

Moreover, only one of the factors we identified in *Jeffries v. Wood*, 114 F.3d 1484 (9th Cir. 1997) (en banc), as poten-

tially diminishing the prejudice created by the jury's consideration of extrinsic information is even arguably present in this case. Those factors are

> whether the prejudicial statement was ambiguously phrased; whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; whether a curative instruction was given or some other step taken to ameliorate the prejudice; the trial context; and whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Id.* at 1491-92 (footnotes omitted).

The majority, in determining that the extrinsic material here does not meet the *Brecht* prejudice standard, judges the prejudicial nature of White's misconduct based on a set of factors it creates largely from thin air: the fact that White's notes also contained material helpful to Fields; the fact that the extrinsic material was introduced early in the deliberations; the fact that the jury was instructed to base its determinations on the law; and the fact that the aggravating evidence against Fields was powerful. Maj. op. at 11984-85. These reasons, with one exception, have no basis in our case law and are, moreover, not pertinent to the prejudice inquiry.

Far from providing "fair assurance" about the harmlessness of the jury misconduct, the majority's first three factors provide no reason to doubt that the Biblical material affected deliberations. The majority's first factor, the balance of White's notes, ignores the record: As the district court found, "all of the Biblical references supported the imposition of the ultimate penalty" and "did not include . . . Biblical references supporting the concepts of forgiveness and mercy." *Fields v. Calderon*, slip op. at 16. So the effect of the Biblical material was exclusively in favor of capital punishment. White's "against" notes were much shorter, were not quotations at all

— let alone lengthy Biblical quotations — and reflected no external research.

The majority's second factor, the early introduction of the Biblical materials into deliberations, actually made the misconduct *worse*, because the jury engaged in very little deliberation unaffected by the religious considerations. *See Lawson*, 60 F.3d at 613 (finding "the early stage at which the extrinsic information was introduced" was one factor dictating that "the juror misconduct substantially and injuriously influenced the verdict"). The majority's third factor, our normal presumption that jurors follow instructions, is inapposite when the jury's very decision to consider the extrinsic evidence conclusively demonstrates that it did not follow the instruction to rely only on the law as stated by the judge. Also, this factor would render all jury misconduct concerning extrinsic material harmless, because jurors are uniformly instructed to rely on the facts and on legally proper considerations.

Ultimately, the only potentially relevant factor cited by the majority for its prejudice analysis is the presence of powerful aggravating evidence in this case. Certainly, the murder charged in this case was extremely brutal and was alleged to have occurred during the course of an extensive violent crime spree. Based on such evidence, I have no doubt that a jury *could* have determined death was the proper punishment for Fields after properly applying California's prescribed weighing system.

Under *Brecht*, however, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *Kotteakos*, 328 U.S. at 765. The manner in which the jury considered the extrinsic Biblical material in this case, as well as its inherently prejudicial nature, demonstrates that the error did substantially influence this jury and that Fields has a right to be resentenced by a jury not so influenced. The California Supreme Court's

analysis of how a *hypothetical* jury would have responded to alternate defense strategies, the basis for the prejudice analysis that the majority opinion quotes at length, is not instructive.

**3.** Not only is the majority's *Brecht* analysis flawed as applied to this specific case, but it ignores the special nature of claims involving jury misconduct. On direct review of federal criminal cases, after a defendant has demonstrated that the jury considered extrinsic evidence, we readily find prejudice absent specific evidence that there was *no* prejudice. *See Rosenthal*, 454 F.3d at 949 ("Extraneous- information cases . . . call for more searching review; we grant a new trial if 'there is a reasonable possibility that the material could have affected the verdict.' . . . [W]e generally place the burden 'on the party opposing a new trial to demonstrate the absence of prejudice.' " (emphasis omitted) (quoting *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 906 (9th Cir. 2000))). This view of prejudice arises from the Supreme Court's presumption of prejudice in *Mattox* and in *Remmer v. United States*, 347 U.S. 227 (1954), when jurors communicate with third parties. *See United States v. Martinez*, 14 F.3d 543, 550 (11th Cir. 1994) (citing *Remmer*, 347 U.S. at 229; *Mattox*, 146 U.S. at 150).[9]

---

[9]This court has previously refused to apply a "strong[ ] presumption" of prejudice to an extrinsic information claim presented in a habeas case and instead specified that the standard *Brecht* analysis applies. *Thompson*, 74 F.3d at 1575 & n.1; *see also Pyles v. Johnson*, 136 F.3d 986, 992-93 (5th Cir. 1998) (rejecting that *Mattox/Remmer*, rather than *Brecht*, provides the correct standard to judge the prejudice of an extrinsic information claim on habeas review); *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994) (per curiam) (same). I believe, however, that a presumption of prejudice may properly apply to an extrinsic information claim even under *Brecht. See Thompson*, 74 F.3d at 1577-82 (Reinhardt, J., dissenting); *see also McNair*, 416 F.3d at 1307 (applying the presumption to an extrinsic information claim presented in a habeas case: "the State bears the burden of rebutting the presumption by showing that the jurors' consideration of the extrinsic evidence was harmless to the defendant"). Moreover, *Thompson*

Even without applying a legal presumption, finding prejudice in cases where a defendant has proved that the jury received extrinsic information somewhat more readily than one might in other instances is quite sensible, both on direct review *and* in habeas. Rule 606(b) of the Federal Rules of Evidence makes it uniquely difficult to prove that extrinsic evidence had an actual effect on jurors. That rule prohibits jurors from testifying "about the subjective effect of [extrinsic] evidence on the particular juror." *Sassounian*, 230 F.3d at 1108. So a court will *never* have admissible evidence directly linking extrinsic materials with a juror's final vote, *see United States v. Rutherford*, 371 F.3d 634, 644 (9th Cir. 2004) (explaining that under Rule 606(b) "a juror cannot testify to whether an outside influence *caused* him to change his vote from innocent to guilty"). As the Eighth Circuit has observed in explaining the *Mattox*/*Remmer* presumption:

> Because Rule 606(b) precludes the district court from investigating the subjective effects of any extrinsic material on the jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice, a presumption of prejudice is created and the burden is on the government to prove harmlessness.

*United States v. Bassler*, 651 F.2d 600, 603 (8th Cir. 1981).

The test we adopted in *Bayramoglu* for determining whether the jury's consideration of extrinsic information is prejudicial has effectively served as our means of mediating

---

is in some tension with our application of the *Mattox* presumption, by requiring the government to "show[ ] that there was no reasonable possibility that the [error] influenced the verdict," in a habeas case involving communication between a juror and a third party. *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 698 (9th Cir. 2004). Nevertheless, I will assume that the *Mattox*/*Remmer* presumption does not apply on habeas review of extrinsic information claims.

between the right to secrecy and finality under Rule 606(b) and a habeas petitioner's constitutional right to a jury untainted by extrinsic evidence. *See Sassounian*, 230 F.3d at 1109 (noting Rule 606(b) requires the court "to ignore the most direct evidence of prejudice . . . lend[ing] an 'Alice in Wonderland quality to the discussion of whether [the defendant] was actually prejudiced by the admitted jury misconduct,' " but holding that the *Bayramoglu* factors led to a determination that the defendant's rights were violated notwithstanding the Rule 606(b) limitation (quoting *People v. Sassounian*, 182 Cal. App. 3d 361, 419 (1986) (Johnson, J., dissenting))); *United States v. Castello*, 526 F. Supp. 847, 849-50 (W.D. Tex. 1981) ("The rule is well established that a jury may not impeach its own verdict. The Court is not at liberty to investigate 'the subjective effects of any breach on any jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice.' Instead, the Court must conduct an inquiry into the prejudicial potential of extraneous material on the average juror. Objective facts, therefore, become the focus of the inquiry." (quoting *Simon v. Kuhlman*, 488 F. Supp. 59, 68 (S.D.N.Y. 1979)) (citations omitted)), *cited in Bayramoglu*, 806 F.2d at 887. The majority's decision not to apply this test in conducting its *Brecht* analysis upsets our settled balance for determining whether "even a single juror's" vote was "improperly influenced" — the relevant constitutional question, *Lawson*, 60 F.3d at 613 — when courts are prohibited from directly finding out from jurors the effect of extrinsic information on their deliberative process.

\* \* \*

In sum, I have no doubt that White engaged in unconstitutional misconduct by injecting his overnight Biblical research into the deliberations, and I am convinced, taking into account the manner in which the material came before the jury, its nature, and our usual test for determining prejudice arising from extrinsic material, that this conduct substantially influ-

enced the jury's penalty phase deliberations. Fields was deprived of his right to have his fate decided by jurors who applied only the applicable legal standards, rather than conflicting standards derived from scripture.[10]

## III.

Fields was not only denied his right to an impartial jury applying the correct law, as the district court found. In addition, the presence of an individual on the jury who, objectively speaking, was not "impartial and indifferent," violated Fields's constitutional rights even before the jury considered the Biblical material during its penalty-phase deliberations. *See Morgan*, 504 U.S. at 727.

The wife of juror Floyd Hilliard had been the victim of an unsolved crime, with details quite similar to the allegations against Fields. The extreme distress generated by the attack — stoked by the fear that the unknown perpetrator would return — was still affecting the family at the time of the trial. Moreover, during the trial Floyd Hilliard was faced with repeated suggestions from his wife that Fields was her rapist, and had to respond nightly to her requests to attend the trial to confirm her suspicions.

Any of these circumstances, independently, would likely place unusual and unpredictable strains on Floyd Hilliard's objectivity. Their combination presents the "extraordinary case[ ], [in which] courts may presume bias based on the cir-

---

[10]Because the jury misconduct renders Fields's death sentence unconstitutional, it is unnecessary to consider whether he received ineffective assistance of counsel during the penalty phase of the trial. I note, however, that his lawyer's blatant deficiencies in investigating his life history and in preparing a mitigation case for the penalty phase of the trial — which "fell below minimum standards" according to the evidentiary referee appointed by the California Supreme Court, 51 Cal. 3d 1063, 1068 (1990) (internal quotation marks omitted) — make the majority's reliance on the weight of the aggravating evidence quite troubling.

cumstances." *Dyer v. Calderon*, 151 F.3d 970, 981 (9th Cir. 1998) (en banc). Because the strain from the combination of these facts was far too likely to affect Floyd Hilliard's deliberative process whether he so recognized or not, his presence on the jury violated Fields's constitutional rights.

## A.

Two-and-one-half years before Floyd Hilliard was called for jury duty, his wife Diane Hilliard, driving home from a Christmas party, had been abducted at gunpoint by a man who rammed her car while it was idling at a traffic light. The assailant forced Diane Hilliard into his car, drove her to a remote location, and pistol-whipped, robbed, and raped her. He then told her, "well, bitch, I'm going to have to shoot you now." His plan, however, was interrupted by a local resident who noticed the suspicious car and came out to investigate. Diane Hilliard recounted that the attacker "threatened to come back to finish me off" before fleeing — a quite plausible threat because he had stolen her purse that contained her home address. When Floyd Hilliard arrived at the hospital after the attack, he found his wife disheveled and in a state of shock, nursing a broken nose, head lacerations, and a black eye. According to his wife, Floyd Hilliard was "shaken," "upset," "shocked," and "angry" upon seeing her injured state. More than twenty-five years later, Diane Hilliard had no hesitation in calling the attack "the most horrifying experience in my life."

According to Diane Hilliard, the crime "radically changed" both her and her husband's life, in part because the perpetrator was never caught. In a 2003 deposition, she confirmed that "[f]or a long time after the attack[,] I lived in terror that he was out there" and feared "that he would come to make good on his threat." Floyd Hilliard also confirmed in a 2003 deposition that the attack was "a very, very upsetting event." Following the attack, Diane Hilliard began carrying a handgun in her purse, and continued to do so during the time of Fields's

trial. And, mirroring his wife's fear, Floyd Hilliard for the first couple of weeks after the attack frequently sat by the window of his house with a shotgun, watching for the rapist's return. Floyd Hilliard testified that if the attacked "had come back, I had something for him. . . . If he made unauthorized entry, enter at your own risk." Diane Hilliard testified that her fear began to subside only when the family moved to a new home, several years *after* Fields's trial.

The allegations against Fields included many of the same crimes — rape, kidnapping, robbery, assault — as those suffered by Diane Hilliard at the hands of a perpetrator still on the loose. Moreover, the details and modus operandi of those crimes had substantial similarities. Diane Hilliard was attacked by a slender African American male in his twenties, which matched the physical description of Fields. She was abducted while driving through a neighborhood only ten minutes away from Fields's house and the area where his crimes occurred. Adding to the similarities, Fields was charged with forcing his victims to enter his car at gunpoint, which was similar to the actions of the person who abducted Diane Hilliard. This court recognized that "Hilliard's wife was the victim of a crime that was quite similar to the charges against Fields" when previously remanding this case for an evidentiary hearing. 309 F.3d 1095, 1105 (9th Cir. 2002).

As the district court's findings on remand demonstrate, Floyd Hilliard and his wife were far from oblivious to the similarity of the crimes at the time of Fields's trial. When informed of the charges involved in the case at the beginning of jury selection, Floyd Hilliard doubted that he would be selected as a juror because of his wife's parallel experience. In response to voir dire questioning about whether any close family members had been victims of a crime, Floyd Hilliard disclosed that his wife was "assaulted and beaten, robbed, two years ago." The district court found that "he did not mention in voir dire that his wife had been raped or kidnaped" because he "did not want to be more explicit in open court than he was

about what happened to his wife" and "thought the court and parties would understand that his use of the word 'assault' in the context he did would encompass a sexual assault." *Fields v. Woodford*, No. CV 92-0465 DT, slip op. at 44 (C.D. Cal. July 30, 2003). In other words, while the district court found Floyd Hilliard was not dishonest in his answer to the voir dire question, the emotional nature of the crime did consciously influence his answers, making him less forthcoming than he might otherwise have been.

After Floyd Hilliard was selected as a juror, his wife repeatedly suggested to him that Fields might be her rapist. In her deposition, Diane Hilliard recounted thinking that "there was a pretty good possibility" that Fields was responsible for her attack. Accordingly, she "begged" *each night* for his permission to attend the trial in order to see if Fields was her rapist. Floyd Hilliard, however, refused these repeated requests. He did, however, himself think during the trial about how the testimony "sound[ed] like what happened to my wife."

The district court found that although Floyd Hilliard did not believe Fields was his wife's abductor because Fields's modus operandi had some differences from the details of her attack, he did not want her "to come to the trial because he did not want her to compromise him as a juror and he did not want the psychological trauma to affect their home life. . . . Mr. Hilliard was concerned his wife would be traumatized by the testimony and that it would create family problems." *Id.* at 31. In his deposition, Floyd Hilliard also explained that he refused his wife's request because "suppose indeed, in fact, she did ID him as the perpetrator . . . then that would invalidate me as a objective juror." He recognized such a development would have required him to disqualify himself as a juror and would have compromised the ongoing trial.

## B.

Most jury bias claims — "actual bias" — must be founded on evidence that a juror "was disposed to cast a vote against" the defendant. *Dyer*, 151 F.3d at 981. But "[i]n extraordinary cases, courts may presume bias based on the circumstances." *Id.* In such cases, the doctrine of "implied bias"[11] disqualifies the affected individual from serving on the jury, and dictates that any defendant whose fate was decided by such a juror has been denied his constitutional right to a fair trial by a panel of "impartial and indifferent" jurors. *Morgan*, 504 U.S. at 727.

The doctrine of implied bias is premised largely on the understanding that certain circumstances create too great a risk of affecting a juror's decisionmaking process, even if the juror is not, consciously, fully aware of the impact. The Supreme Court focused on this rationale in explaining why implied bias has traditionally disqualified individuals who had employment relationships with the parties from jury service:

> Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relations with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence. The law therefore most wisely says that with regard to some of the relations which may exist between the juror and one of the parties, bias is

---

[11]I use the "implied bias" nomenclature because it is the term used in the applicable case law. I note, however, that the term somewhat misleadingly suggests that the doctrine rests on the implication of "actual bias" — that is, conscious prejudice or prejudgment — as a matter of law from certain facts. As I explain below, the doctrine actually focuses on a different kind of effect on the deliberative process.

implied, and evidence of its actual existence need
not be given.

*Crawford v. United States*, 212 U.S. 183, 196 (1909); *see also
Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J.,
concurring) ("Determining whether a juror is biased or has
prejudged a case is difficult, partly because the juror may
have an interest in concealing his own bias and *partly because
the juror may be unaware of it*." (emphasis added)). In this
respect, the implied bias doctrine applied to jurors parallels
conflict-of-interest rules that apply to lawyers and judges. *See
Dyer*, 151 F.3d at 983 n.22. Those rules "ban[ ] lawyers and
judges from taking on cases in certain conflict situations even
if they are certain that the objective conflict will have no
influence on them and are prepared to take every precaution
to preclude such influence," because "[h]uman self-perception
regarding one's own motives for particular actions in difficult
circumstances is too faulty to be relied upon, even if the indi-
vidual reporting is telling the truth as he perceives it." *United
States v. Shwayder*, 312 F.3d 1109, 1119 (9th Cir. 2002).
Floyd Hilliard's own deposition attests to the wisdom of
applying a similar rule to jurors: In explaining why he
responded only "I doubt it," rather than more definitively, to
a voir dire question about whether it would be difficult for
him to be an impartial juror, he noted "you can never be sure
what's in the back of your mind."

Accordingly, the implied bias doctrine applies in circum-
stances where a juror "introduces . . . [an] unpredictable factor
into the jury room" or "introduces destructive uncertainties
into the [factfinding] process." *Dyer*, 151 F.3d at 982-83. In
such cases, we do not consider the actual bias question of
"whether [the juror] was disposed to cast a vote against [the
defendant]." *Id*. at 981. It would not matter if the juror is
found to have no actual bias against the defendant, because
his "substantial emotional involvement" with some aspect of
the case creates too great a risk of altering the jury's delibera-
tions despite the juror's conviction that it will (or did) not. *See*

*Allsup*, 566 F.2d at 71 (holding that implied bias applied to two bank tellers in a trial concerning the robbery of another branch of the bank for which they worked); *see also United States v. Wood*, 299 U.S. 123, 134 (1936) (describing implied bias as "a bias attributable in law to the prospective juror regardless of actual partiality"). As Judge Kozinski cogently observed on behalf of an en banc court:

> Of course, a juror could be a witness or even a victim of the crime, perhaps a relative of one of the lawyers or the judge, and still be perfectly fair and objective. Yet we would be quite troubled if one of the jurors turned out to be the prosecutor's brother because it is highly unlikely that an individual will remain impartial and objective when a blood relative has a stake in the outcome. Even if the putative juror swears up and down that it will not affect his judgment, we presume conclusively that he will not leave his kinship at the jury room door. The effect of this factor would be impossible to predict: Would the juror yield to his sympathies, or fight them and lean the other way? There is no way to know, but permitting such a juror to serve would introduce into the jury room an extraneous influence that could materially color the deliberations.

*Dyer*, 151 F.3d at 982. In other words, the implied bias doctrine exists principally to disqualify jurors who have an excess *probability* of being influenced in their deliberations by an extraneous consideration, despite their good faith belief that they can avoid doing so. It is not directed primarily at uncovering jurors hiding their conscious bias, although in some cases of implied bias that may be so.[12]

---

[12]There also may be jurors who do have thoughts during deliberations that reflect the relationship to the facts of the case that gives rise to implied bias, but suppress the memory of their actual deliberative process sufficiently that, after the trial, they swear up and down — and believe — that there was no actual bias whatever. The implied bias doctrine ferrets out jurors affected by that psychological phenomenon as well.

We have identified certain "general fact situations where bias might be presumed or implied." *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (9th Cir. 1997). One of those situations is "where a juror *or his close relatives* have been personally involved in a situation involving a similar fact pattern." *Tinsley*, 895 F.2d at 528 (emphasis added). Our inquiry, however, must be specifically tailored to the facts alleged to create implied bias, because we must "hesitate before formulating categories of relationships which bar jurors from serving." *Id.* at 527.

In conducting this specifically tailored analysis, we must determine the effect on "an *average* person in the position of the juror in controversy," because "the implied bias standard is essentially an objective one." *United States v. Gonzalez*, 214 F.3d 1109, 1112-13 (9th Cir. 2000) (emphases omitted) (quoting *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1260-61 (10th Cir. 1999)).[13] So, in evaluating whether the implied bias doctrine applies, we disregard a juror's claims that he was not affected by his connection to the case. *Id.* at 1113. We do so because an underpinning of the implied bias doctrine is the recognition that the juror will often be unable to see for himself the effects of the connection. As *Dyer* observed, "[a juror] may declare that notwithstanding these prejudices he is determined to listen to the evidence, and be governed by it; *but the law will not trust him.*" 151 F.3d at 984 (quoting *United States v. Burr*, 25 F. Cas. 49, 50 (C.C.D. Va. 1807) (No. 14,692g) (Marshall, J.)) (internal quotation marks omitted). This lack of trust, I emphasize once more, is *not* an unrebuttable presumption of dishonesty — or of lack of good faith — but, instead, a practical recognition of the complexities of human mental processes.

---

[13]In addition to the Tenth Circuit's decision in *Cerrato-Reyes*, upon which our holding in *Gonzalez* relies, three other circuits have specified that implied bias analysis is concerned with the objective effect of the fact situation on an "average person." *Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 58 (2006); *United States v. Torres*, 128 F.3d 38, 45 (2d Cir. 1997); *Person*, 854 F.2d at 664.

After engaging in the objective inquiry dictated by our precedents, I can only conclude that the deliberative process is likely to be affected for an average person who has *both (1) feared for the safety of a spouse previously victimized by a quite similar, highly violent, terribly upsetting crime committed by a perpetrator still at large, and* (2) been confronted with his spouse's repeated speculations about a link between the defendant and her rapist every day of the trial, including requests to attend the trial in light of such speculation. The average person in such a situation undoubtedly will feel "substantial emotional involvement" with the crimes charged against the defendant, which we have noted is an indicia of implied bias. *Tinsley*, 895 F.2d at 527 (quoting *Allsup*, 566 F.2d at 71).

Indeed, there is direct evidence that Floyd Hilliard's emotional involvement *did* influence his thought process to some degree during the trial: Floyd Hilliard stated during his 2003 deposition, it was "only a natural response" for him to recognize during the course of the trial that the testimony "sounds like what happened to my wife," and the trial did "trigger a memory that . . . my wife had a similar thing." And Floyd Hilliard was concerned during the trial that the link between the facts developed during Fields's trial and those of the crime against his wife were so close that it could be traumatic for his spouse to attend the trial. As Floyd Hilliard was far from indifferent during Fields's trial to the similarities with the crime against his wife, it would have been an equally "natural response" for the similarities to affect his final deliberative process, without him being quite aware of the impact. *Cf. Allsup*, 566 F.2d at 71-72 (observing implied bias arose in part because the juror had a "reasonable apprehension of violence" from those who committed the crime on trial).

In short, permitting the average juror in Floyd Hilliard's very unusual position to serve as a juror "would introduce into the jury room an extraneous influence that could materially color the deliberations. The juror in question would be lacking

the quality of indifference which, along with impartiality, is the hallmark of an unbiased juror." *Dyer*, 151 F.3d at 982. Accordingly, Fields's constitutional right to a fair trial by a panel of "impartial and indifferent" jurors was violated by Floyd Hilliard's presence in deliberations. *See Morgan*, 504 U.S. at 727.

Given these close, emotionally charged, and ongoing links between Fields's trial and the rape of Diane Hilliard in the same area a couple of years earlier by a rapist who was still at large, the majority's observation that "[b]eing the spouse of a rape victim is not, *in and of itself*, such an 'extreme' or 'extraordinary' situation that it should automatically disqualify one from serving on a jury in a case that involves rape" is quite beside the point. Maj. op. at 11972 (emphasis added). Our case law indicates that we should not inquire at such a general level about the effect of a relationship with the trial. *See Tinsley*, 895 F.2d at 527. That admonition applies in spades in this case. For, although the majority tries to segregate out and minimize the impact of the Hilliards' struggle *during* the trial over whether Diane Hilliard could attend, in fact that struggle is critical in assessing the implied bias issue in this case.[14] The daily discussions between Floyd Hilliard and his wife plainly had emotional content of their own *and* brought back to Floyd Hilliard on a daily basis the emotional impact of the connection between the brutal facts proved at trial and the brutal attack on his wife. No other case of which I am aware concerning implied bias arising from similarities between the offense being tried and the experiences of a juror's close relative has this exceptional feature — that the

---

[14]The majority maintains, Maj. Op. at 11973 n.13, that a consideration of the discussions between Hilliard and his wife during trial would transform the implied bias inquiry from an objective analysis of the relationship between a juror and the trial into a subjective one. This is not so. Our analysis is still based on objectively observable facts that make it possible to infer bias as a matter of law with regard to any reasonable juror who finds himself in the same circumstances. Here, those circumstances include the mid-trial interactions between Hilliard and his wife.

juror could *not* put the link fully behind him during the trial, because it kept arising, daily, at home. And, as the jury deliberations took place at the end of the trial, not the beginning, the impact of the mid-trial discussion is not a side issue, as the majority supposes, but is all-important.[15]

## C.

The majority, nonetheless, concludes that it "see[s] no basis for inferring bias now as a matter of law," "[g]iven Hilliard's honest response on voir dire that revealed a potentially disqualifying relationship, but not an extreme or extraordinary one, and the results of the evidentiary hearing which disclosed no actual bias." Maj. op. at 11973 (emphasis added). But neither Floyd Hilliard's honest response nor his lack of actual bias answer the dispositive implied bias question — whether this case's facts present an extraordinary situation to which implied bias applies.

**1.**   In rejecting Fields's implied bias claim, the majority

---

[15]The majority suggests that an implied bias analysis does not allow consideration of circumstances that arose after voir dire, and that such circumstances can only be analyzed as "extrinsic influence" or "ex parte communications." *See* Maj. Op. at 11973-74 n.14. True, many circumstances that arise after voir dire and that are relevant to implied bias will also involve inappropriate ex parte communications or extrinsic influence — for example, if a family or business relationship were to develop between a juror and the prosecutor or defendant after the trial had begun. But the fact that a circumstance also involves ex parte communication does not prevent a holding of implied bias where an "extraordinary" relationship between the juror and the case arises only after the trial begins. So, for example, if after voir dire but during trial a juror were the victim of a crime similar to the one being tried, the appropriate inquiry would still be for implied bias. Such an event would be entirely collateral to the trial, involving no one connected to it nor any of the facts before the jury, yet could influence an average person's impartiality. Moreover, my analysis is simply an application of the existing case law on implied bias to the unusual facts in this case, and not a new rule subject to the constraints of *Teague* as the majority suggests. Maj. Op. at 11974 n.14.

stresses the district court's finding that Floyd Hilliard was not dishonest during voir dire. *See* Maj. op. at 11970 ("[D]ishonesty in voir dire is the critical factor."); *id.* at 11970 ("Although we have recognized that bias may be implied where close relatives of a juror 'have been personally involved in a situation involving a similar fact pattern,' we have never actually done so when the juror was honest on voir dire. We decline to do so here." (citations omitted)). In my view, given (1) the close similarities between the accusations against Fields and the crime against Diane Hilliard *combined* with (2) the strong, fully understandable emotional reaction of the Hilliards to the crime and (3) the fact that Floyd Hilliard had to deal with his wife's repeated suggestions during the trial that Fields was her assailant, Floyd Hilliard's honesty or lack thereof matters little to the implied bias analysis.

As a general matter, the implied bias question is analytically distinct from the question of whether a juror was honest during voir dire: The former determines whether a juror was categorically unfit to serve as an impartial, indifferent juror; the latter determines whether a juror shortchanged the defendant's right to learn about jurors' proclivities through voir dire.[16]

The separate opinions by the Supreme Court in *McDonough Power Equipment, Inc. v. Greenwood* establish this distinction. Focusing on the harm that the appellant alleged

[16]Of course, if an honest voir dire answer causes the defendant to become fully aware of the facts creating the implied bias, and he fails to request that the judge excuse the juror for cause, then he cannot ask for his conviction to be reversed on the jury bias ground. *See United States v. Bolinger*, 837 F.2d 436, 439 (11th Cir. 1988) (per curiam) ("Thus, where the defendant or defense counsel knows of juror misconduct or bias before the verdict is returned but fails to share this knowledge with the court until after the verdict is announced, the misconduct may not be raised as a ground for a new trial."). Because Floyd Hilliard's voir dire answers did not — and could not, because many of the relevant facts arose only after jury selection — reveal all of the relevant facts, waiver does not apply in this case.

arose "because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination," the principal opinion held that an appellant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*" to receive a new trial on that basis. *McDonough*, 464 U.S. at 555-56. Five Justices, however, made clear that a juror could still be *substantively* biased, and unsuitable for jury service, regardless of whether his or her lies undermined the appellant's procedural voir dire right. *See id.* at 556-57 (Blackmun, J., joined by Stevens and O'Connor, JJ., concurring) ("[R]egardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate . . . in exceptional circumstances, that the facts are such that bias is to be inferred.); *id.* at 558 (Brennan, J., joined by Marshall, J., concurring in judgment) ("[F]or a court to determine properly whether bias exists, it must consider at least two questions: are there any facts in the case suggesting that bias should be conclusively presumed; and, if not, is it more probable than not that the juror was actually biased against the litigant. Whether the juror answered a particular question on *voir dire* honestly or dishonestly, or whether an inaccurate answer was inadvertent or intention, are simply factors to be considered *in this latter determination of actual bias*." (emphasis added)).

This interpretation of *McDonough* has been adopted by four other circuits. *See Gonzales v. Thomas*, 99 F.3d 978, 985-86 (10th Cir. 1996) (holding a defendant who fails to show a juror dishonestly answered a question during voir dire, pursuant to *McDonough*'s principal opinion, still has "the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury," including the use of implied bias (quoting *McDonough*, 464 U.S. at 556 (Blackmun, J., concurring)) (internal quotation marks omitted)); *accord Zerka v. Green*, 49 F.3d 1181, 1186 n.7 (6th Cir. 1995); *Amirault v. Fair*, 968 F.2d 1404, 1405-06 (1st Cir.

1992) (per curiam); *Cannon v. Lockhart*, 850 F.2d 437, 440 (8th Cir. 1988). The majority's opinion initially recognizes this interpretation of *McDonough* by explaining there are *three* theories of juror bias — *McDonough*-style bias, actual bias, and implied bias — but later collapses these theories through its singular focus on whether Floyd Hilliard told the truth during voir dire. *Compare* Maj. op. at 11957-58, *with id.* at 11968-74. *See also id.* at 11968 (noting "the existence of safeguards *against actual bias*" and describing voir dire as "[t]he prime safeguard" (emphasis added) (quoting *Tinsley*, 895 F.2d at 527-28) (internal quotation mark omitted)).[17]

Moreover, logic dictates that a juror's honesty in voir dire cannot affect a determination that his ties to the case present an "exceptional circumstance" making him categorically unfit to deliberate. Whether such a juror tells the truth or lies during voir dire does not change the likelihood that his deliberative process will be unconsciously affected by his emotional involvement in the case. To borrow from Judge Konziski's analysis in *Dyer*,

> [u]nder the [majority's] logic, reasonable jurists could hold that [Fields] would have been accorded due process even if he had been convicted by a jury comprised of the following twelve individuals: (1) the mother of . . . the prosecutor, (2) [the prosecutor's] former law partner, (3) [Los Angeles's] Chief

---

[17]I accept the majority's implicit suggestion that implied bias operates to exclude a broader category of individuals when raised as a for-cause challenge during voir dire than when raised for the first time on appeal. *See* Maj. op. at 11971 (suggesting follow-up questioning of Floyd Hilliard could have established implied bias mandating his excusal for cause); *cf. Torres*, 128 F.3d at 46-47 (noting the category of "inferable bias," which unlike "implied bias" does not absolutely disqualify a juror but allows a trial judge to sustain a for-cause challenge without a showing of actual bias). I note, however, that the Supreme Court's explanations of implied bias have come in cases — *McDonough* and *Phillips* — in which the juror bias claim was raised for the first time on appeal.

of Police, (4) the Grand Dragon of the [Los Angeles] KKK, (5) the sister of [the victim] who died in the shooting, (6) [the murder victim's] mother, (7) the victim of [Fields's] prior [rape], (8) [Fields's] ex-wife, (9) the District Attorney, (10) a[ ] [Los Angeles] councilman running for re-election on a "tough-on-crime" platform, (11) [Fields's] cellmate, and (12) [Hilliard's] wife . . . — so long as they had all sworn they [were] fair.

151 F.3d at 985. Like the *Dyer* majority, I believe the presence of any of these individuals on Fields's jury would have deprived him of a fair trial. And that would be the case equally whether they lied during voir dire about their disqualifying characteristic *or were fully truthful*. Dishonesty is central to a *McDonough*-style claim, and is of relevance to an actual bias contention because lying on voir dire can suggest an attempt to avoid disqualification and thereby to act on one's bias. But dishonesty during voir dire has little to do in general with the concerns underlying the implied bias doctrine.

Moreover, Floyd Hilliard's honesty during voir dire is, if anything, doubly irrelevant to the implied bias inquiry because critical factors supporting a implied bias finding in this case — perhaps the most important — arose after voir dire. No amount of voir dire questioning could have uncovered the fact that Diane Hilliard suggested repeatedly during trial that Fields might be her attacker and begged Floyd Hilliard to allow her to attend the trial, and that Floyd Hilliard refused to accede, in part because of fear of traumatizing his wife. Although the majority fails to consider whether these emotionally charged interactions *after* voir dire created implied bias, *see* Maj. op. at 11971-72, 11974-75 (rejecting Fields's claims that developments after voir dire rendered Floyd Hilliard a biased juror, because the district court found Floyd Hilliard had no actual bias and did not believe his wife's speculation), such bias can arise from, or be reinforced

by, events that occur during the course of the trial, *see Brooks v. Dretke*, 418 F.3d 430, 431, 434-35 (5th Cir. 2005) (finding implied bias when a juror was arrested during trial); *Hunley v. Godinez*, 975 F.2d 316, 320 (7th Cir. 1992) (holding that implied bias arose when jurors were robbed during deliberations, and noting that a juror's exposure to the biasing factor occurs after voir dire "may present an even more compelling reason for applying the presumption of bias").

In short, Floyd Hilliard's honesty in voir dire is entirely besides the point in applying the implied bias doctrine to the unique circumstances before us.

**2.**   Based on the district court's finding that Floyd Hilliard was not biased in fact, and our deferential standard of review in reviewing such findings, the majority quickly dismisses Fields's actual bias claim. Maj. op. at 11961. I agree that the district court's findings dictate such a result. That conclusion should end the discussion of whether Floyd Hilliard was actually biased against Fields. *See Dyer*, 151 F.3d at 981 (explaining the distinction of the actual bias and implied bias questions).

The majority, however, regularly refers to the district court's finding of no actual bias throughout the following nineteen pages purportedly devoted to the implied bias question. *See, e.g.*, Maj. op. at 11972 ("Here, the evidentiary hearing showed no actual effect of his wife's experience, or of their conversation, on Hilliard's ability to be fair and impartial."). Moreover, the majority entirely dismisses any claim of implied bias arising from facts occurring after voir dire on the basis that "the district court afforded Fields an opportunity to show that Hilliard was not a fair and impartial juror" — the test for actual bias — and "[h]e failed to do so." Maj. op. at 11971. But these findings concerning Floyd Hilliard's actual bias are irrelevant to implied bias. *See Gonzales*, 214 F.3d at 1113 ("[A] court will, where the objective facts require a determination of such bias, hold that a juror must be recused

even where the juror affirmatively asserts (or even believes) that he or she can and will be impartial."); *Dyer*, 151 F.3d at 984 ("[A juror] may declare that notwithstanding these [implied] prejudices he is determined to listen to the evidence, and be governed by it; *but the law will not trust him.*" (quoting *Burr*, 25 F. Cas. at 50) (internal quotation marks omitted)). The majority's attempt to side step the true issue in this case does nothing to change my determination that this case presents an "exceptional circumstance" in which implied bias exists.

\* \* \*

Because of the many similarities between the rape of Diane Hilliard — a crime that greatly affected both Floyd Hilliard and his wife — and the crime that Fields was on trial for committing, *combined with* Diane Hilliard's suggestions that Fields might be her rapist and her repeated requests to attend the trial that raised concerns about her emotional well-being, the required objective inquiry should lead us to hold that Floyd Hilliard "introduce[d] . . . [an] unpredictable factor into the jury room" and "introduce[d] destructive uncertainties into the [factfinding] process." *Dyer*, 151 F.3d at 982-83. Floyd Hilliard may "swear[ ] up and down that it [did] not affect his judgment, [but] we presume conclusively that he will not leave [these influences] at the jury room door." *Id*. at 982. As in *Dyer*, "[m]ore is at stake here than the rights of petitioner; 'justice must satisfy the appearance of justice.' " *Id*. at 983 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)); *see also id*. at 981 (noting the possibility that the impliedly biased juror "could have harbored some empathy *for criminal defendants*" (emphasis added)). Such an appearance was lacking regardless of Floyd Hilliard's claims of conscious fairness — and even if in fact Floyd Hilliard was, as far as he was aware, not influenced by the confluence of circumstances giving rise to implied bias.

### IV.

The State of California accused Stevie Lamar Fields of committing a series of heinous crimes and maintains he should be executed. The Constitution entitled Fields to have a set of impartial jurors make such a determination in accordance with the state's penal statutes. Because the record raises substantial doubts whether Fields's fate was decided by such a jury, the state may not execute him absent a retrial. I therefore dissent.